Caroline ESFANDIARI, et al., Plaintiffs,

v.

**UNITED STATES of America,
Defendant.**

Civ. A. No. 91–2748–LFO.

United States District Court,
District of Columbia.

Dec. 23, 1992.

Thomas Fortune Fay, Washington, DC,
for plaintiffs.

Mark E. Nagle, Asst. U.S. Atty., Washington, DC, for defendant.

MEMORANDUM

OBERDORFER, District Judge.

This is a medical malpractice action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Plaintiffs Caroline Esfandiari and Keith Arnold Weeks are the co-executors of the estate of the late Captain Harold Knox Edwards (U.S. Navy—Retired), who died on October 14, 1990 after a prostate cancer metastasized to his spine and elsewhere. The treatment of the decedent's condition by Army physicians at the Walter Reed Army Medical Center and Andrew Rader Clinic is put in issue by this lawsuit. A bench trial was held on December 1–2, 8, and 21. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52.

## I. FINDINGS OF FACT

### A. *Treatment During 1986–1987*

On November 5, 1986, Captain Edwards, who was then 78 years of age, visited the Andrew Rader Clinic at Fort Myer, Virginia, complaining of a four-day history of constipation and urinary retention. He was sent to the emergency room at Walter Reed Army Medical Center for further examination. He was diagnosed with a urinary tract infection and referred to the Urology Service.

Captain Edwards was evaluated by the Urology Service on November 6, 1986. At that time, the Urology Service undertook procedures with the purpose of ruling out urinary tract infection and prostatitis as well as cancer of the prostate. A prostate biopsy and cystoscopy were performed on November 17. The biopsy was negative, but the cystoscopy revealed a one- by two-centimeter bladder tumor. A transurethral resection of the bladder tumor (TURBT) and a transurethral resection of the prostate (TURP) were scheduled for December 1986.

The TURBT was performed on December 17, 1986. The pathology on the tumor was positive for a papillary transitional cell carcinoma of the bladder. The TURBT proce-

dure completely and finally cured the bladder cancer. Captain Edwards was discharged from the hospital.

He was readmitted in January 1987. The TURP was performed on January 5, 1987. Pathology of the surgical debris proved positive for extensive invasive moderate to poorly differentiated adenocarcinoma consistent with prostatic primary. The "moderate to poorly differentiated" classification indicated that the cancer lesion was more aggressive than a well-differentiated lesion, requiring more aggressive treatment. The stage of the cancer was classified as "A–2," meaning that the cancer had not progressed beyond the prostate, that it was not detectable by simple palpitation, and that the cancer cell count was above the level indicative of a stage A–1 cancer.

A discharge form dated January 8, 1987 contains the following notation in Captain Edwards' handwriting in a blank captioned "Diet": "Every three months call 576–4117–8 ask appt. with Dr. Bishop or Moul for follow-up on *bladder cancer.*" (Emphasis added). Drs. Jay Bishop and Judd Moul were urologists on the Walter Reed staff.

Captain Edwards returned to Walter Reed for a follow-up visit to the Urology Service on February 6, 1987. He was seen by Dr. Moul. He noted that the pathology records revealed extensive poorly differentiated cancer of the prostate. Dr. Moul recommended that Captain Edwards undergo a workup to determine whether there was any metastatic disease.

On March 2, 1987, Captain Edwards' case was presented to Walter Reed's Urology Service Tumor Board. The Tumor Board included Dr. Bishop and Dr. James McNab, a military officer who was Chief of the Radiation Therapy/Oncology Service. The Tumor Board concluded that Captain Edwards had stage A–2 prostate cancer and recommended radiation therapy.

In early March 1987, soon after the Tumor Board reached its conclusion, Dr. Bishop saw Captain Edwards at Walter Reed, apparently by appointment. Dr. Bishop informed Captain Edwards of his prostate cancer, recommended radiation therapy for the condition, and referred Edwards to Dr. McNab.

On March 11, 1987, Captain Edwards was seen by Dr. McNab pursuant to Dr. Bishop's referral. Dr. McNab testified in a videotaped deposition that he did not specifically recall any meetings with Captain Edwards or what he had said to Captain Edwards. He did recognize his signature on a form under the heading "Consultation Report." On the form he had written:

> Patient seen and examined. Counseled extensively regarding nature of his malignancy and role of radiation in its management. At this point in time patient does not desire any further medical treatment for his prostate. He is content to delay treatment until he becomes symptomatic.

Dr. McNab stated that his typical consultation was one to two hours in length. When asked what advice he gave to Captain Edwards during the March 1987 consultation, Dr. McNab stated:

> I can't tell from the medical records. As a matter of practice, *I always give patients the choice of observation as an option in treatment.* For treatment of early stage prostate cancer, there are multiple approaches. Radiation is only one of these. Alternatives include radical prostatectomy, castration, estrogen administration, various other forms of hormonal therapy. (emphasis added).

Upon being asked whether it was possible that he advised Captain Edwards that radiation therapy was not necessary, Dr. McNab replied: "I doubt that. I—again, I give patients an extensive explanation as to what the disease is, what the risk and benefit of treatment are and then the patient really has the choice." Dr. McNab further stated that he "would have told [Captain Edwards] what the likely outcome of [radiation] treatment would have been and that for high grade poorly differentiated tumors the ultimate cure rate is only 60 percent with treatment." He also testified regarding the option of radiation treatment as opposed to simple observation:

> My understanding then is as it is today, that there is no difference in the ultimate

survival rate with or without radiation treatment. The value of radiation is to keep the urinary tract open. This was a man who had just required a transurethral resection of his prostate. The only benefit of giving him radiation would have been to preserve p[o]tency of the urinary tract. Treatment would not have prevented subsequent development of metastatic disease.

In addition, Dr. McNab testified that the physicians at Walter Reed "never told a patient that they—that nothing needed to be done. At a very minimum periodic follow-up, medical examination was important. The burden for obtaining follow-up appointment was the patient's." Dr. McNab stated that he was "sure that after seeing Mr. Edwards in March 1987 that [he] would have ensured that he had some follow-up appointment."

Captain Edwards, on *de bene esse* deposition, recounted his March 1987 meeting with Dr. McNab in the following way:

He said, "A good doctor is always going to protect his patients," and then he told me the case history they had known on it [sic], that that was normal to have those cells in there, that if those Wild Indian cells had been going to cause me cancer, I would have been in pain a hell of a long time before. He had no objection to giving me the treatment or sending me to Fairfax or this hospital, you can get it every one the same, and he said, "We'll burn that prostate to a cinder," and he said, "You will probably lose hair and experience some nausea and that sort of thing, but if you want to, we are perfectly happy to do it." He just thought it was unnecessary.

On April 29, 1987, Captain Edwards returned to the Walter Reed Urology Service and was again seen by Dr. Bishop. Dr. Bishop advised Captain Edwards that he was suffering from prostate cancer—which he termed "wild Indian cells," according to Captain Edwards' deposition testimony—and recommended radiation therapy in an emphatic way, again referring Captain Edwards to Dr. McNab for that purpose.

Captain Edwards then, on April 29, 1987, went to see Dr. McNab in Radiation/Oncology for the second time and informed him of Dr. Bishop's recommended treatment. Dr. McNab offered to provide the radiation therapy and suggested the alternative of receiving the radiation therapy at Fairfax Hospital. According to Captain Edwards' testimony, however, Dr. McNab reiterated "[p]retty much the same thing both times, except much stronger the second time.... He wasn't saying 'Don't do it.' He just said, 'All the evidence I have, including this outstanding doctor, says why go through all that pain?'" In addition, there is no evidence that Dr. McNab took any step following the April 29 visit to insure, by scheduled follow-up, a specific appointment or recommended sequence of appointments either for radiation or for periodic observation for prostate cancer.

At some point after the consultations of April 29, Captain Edwards filled out and returned a "Tumor Registry Questionnaire" sent to him from Walter Reed. A typewritten notation on the questionnaire bearing the initials "H.K.E." (Harold K. Edwards) reads: "Radiologist ready to treat. However said cancer cells common in older male prostates. Mine probably there for years. Would have caused trouble long ago if intended. Radiologist at another hospital said same.... Elected not to take it. Am solely responsible for any consequences." In explaining this last sentence on the Questionnaire, Captain Edwards testified that he had felt that "[t]his officer has to be protected" and that he had wanted to make "a very clear statement that any decision made was my decision." When asked to what extent his decision regarding treatment was based on Dr. McNab's advice, Captain Edwards responded: "I would say 100 percent, plus, of course, the knowledge of my own family's case history of no cancer." Unbeknownst to Captain Edwards, there being no legend on the form, it was considered and filed at Walter Reed solely for statistical purposes. It was not intended for consideration by either the Urology or the Radiation Therapy/Oncology Service, did not come to the attention of any of the Walter Reed doctors

who had previously seen Captain Edwards, and was not placed in any medical file pertaining to his case.

On the basis of all the evidence, it is more likely than not likely that Dr. McNab did not communicate to Captain Edwards an appropriate recommendation for radiation therapy. Captain Edwards testified that Dr. McNab advised him at the March 1987 meeting that radiation therapy was "unnecessary," and that it was "normal to have those cells in there, that if those wild Indian cells had been going to cause me cancer, I would have been in pain a hell of a long time before." Dr. McNab testified in his deposition that, although he did not specifically recall any meetings with Captain Edwards, he would not likely have given the advice as related by Captain Edwards. However, the record contains no notes taken by Dr. McNab from the April 1987 consultation and only brief notes from the March 1987 meeting. It is more likely than not that Dr. McNab's advice during this meeting followed his usual practice in a case like that of Captain Edwards: a statement of options ranging from castration through radiation therapy to mere "observation," with the understanding that the choice among these options would be made by the patient. While the wording of Dr. McNab's advice may not have been precisely as recounted by Captain Edwards, his essential testimony corroborates that of Dr. McNab to support the reasonable inference that on neither occasion did he recommend radiation therapy, the course of treatment affirmatively recommended by the Tumor Board. Upon being asked whether he had told Captain Edwards that radiation therapy was unnecessary, Dr. McNab twice responded by stating that he ordinarily gave such patients a series of options, including observation. Further, Captain Edward's version appears to be consistent with Dr. McNab's view of the efficacy of radiation therapy, particularly for someone of Captain Edwards' age: McNab stated, among other things, that he believed there is "no difference in the ultimate survival rate with or without radiation treatment."

[1] Dr. McNab's failure to affirmatively recommend radiation therapy for Captain Edwards' condition, including his possibly inadvertent, but nevertheless effective, nullification of the recommendations of the Tumor Board and of Dr. Bishop, as well as McNab's failure even to insure follow-up observation of the Captain's condition after the April 29 consultation, violated the standard of care and was a proximate cause of injury to him. Moreover, Captain Edwards reasonably gained the impression in March and April of 1987 that radiation treatment would not be more beneficial than mere observation and that it involved deleterious side effects.[1]

This finding rests primarily on the testimony of Dr. Steven Carabell, a well-credentialed and impressive expert, who testified at trial for the plaintiffs. According to Dr. Carabell, the standard of care required radiation therapy or some other form of active treatment of Captain Edwards' condition. In Carabell's opinion, as of early 1987 Captain Edwards' cancer was "potentially curable," and the probability of a cure with radiation therapy or other treatment was 50 to 70 percent. The defendant's expert, Dr. John Lynch, testified that, although he did not believe a cure was likely, radiation therapy could have slowed the progression of the disease and prevented some of its symptoms, as well as possibly extended Captain Edwards' life. Even Dr. Bishop testified that "if he had received the radiation therapy at the time it was recommended, he would have had an increased chance for cure, he would have had a chance at all [sic] for cure."

Dr. Bishop's advice to Captain Edwards in April 1987 to return to Dr. McNab for radiation was consistent with the standard of care. However, Dr. McNab's offer of radiation treatment together with his reiterated denigration of the benefits of radiation effectively nullified Dr. Bishop's

---

1. Captain Edwards could also have reasonably believed that his answer on the Tumor Registry Questionnaire would be seen by the Walter Reed doctors who had treated him and that they would correct him if the form reflected any misunderstanding about their diagnoses and advice.

strong prescription for it and violated the standard of care. Thus, Captain Edwards, a layman, was left to choose between what he could reasonably consider to be the conflicting advice of Dr. Bishop, the urologist, and Dr. McNab, the Chief of the Radiation Therapy/Oncology Service at Walter Reed and a military officer, who, as a matter of fact, had the last word. Moreover, it is the institution—and not either of the doctors—that is the defendant here. The failure of the institution to reconcile the disparate opinions and cause Captain Edwards to receive a clear and understandable recommendation to obtain radiation therapy also violated the standard of care.

For related reasons, the follow-up care provided Captain Edwards by the defendant at its Walter Reed facility was also a deviation from the medical standard of care. Dr. Carabell testified that in his view Captain Edwards had been "lost to follow-up" from 1987 to 1989—that due to a failure of communication the doctors at Walter Reed had essentially "dropped the ball" in treating him. As the defendant points out, when Captain Edwards was originally discharged from Walter Reed following the TURP procedure in January 1987, he was apparently told to call the hospital every three months. A discharge form dated January 8, 1987 contains a notation in Edwards' handwriting stating: "Every three months call 576–4117–8 ask appt. with Dr. Bishop or Moul for follow-up on bladder cancer." This instruction, however, does not preclude the defendant's liability. First, the three-month instruction was related specifically to Captain Edward's malignant bladder tumor. That lesion had been successfully treated by January 1987 and the decedent so advised. A reasonably prudent patient could reasonably conclude that the three-month follow-up instruction for treatment of the bladder cancer did not survive its excision. Moreover, the intervening consultations with Dr. Bishop and Dr. McNab during March and April of 1987 ended with Dr. McNab's April reiteration of his previous advice, which, as stated, effectively nullified Dr. Bishop's radiation recommendation. As a result, Captain Edwards reasonably understood that he could

safely choose between mere "observation" and radiation therapy, and was left without effective medical direction for the pursuit of either course. Captain Edwards then decided not to pursue radiation therapy in reliance on what he reasonably perceived to be the advice of Dr. McNab. Even if mere observation was an acceptable alternative to radiation, the standard of care required follow-up. There was no evidence that McNab took any step at or after the April 29, 1987 visit to him to insure periodic follow-up visits by Captain Edwards about his prostate cancer or even to advise him effectively of the critical benefits of doing so.

With respect to both the Captain's following what he understood to be Dr. McNab's advice instead of Dr. Bishop's and the failure to pursue follow-up visits on his own initiative, Captain Edwards may not have acted as prudently as some other patient in his situation might have. But the standard of care governing a medical institution such as Walter Reed and its specialized staff imposed an obligation to provide clear and unequivocal advice that he obtain radiation treatment and, in any event, effective follow-up. The evidence establishes that the defendant failed to comply with this standard of care. Thus, any shortcoming in Captain Edwards' response to what he reasonably perceived as conflicting advice did not constitute contributory negligence.

The defendant's departure from the standard of care proximately caused injury to plaintiffs' decedent. Expert testimony (including an admission by Dr. McNab) established that radiation therapy can be successful in 60 percent of cases like Edwards'. Indeed, other experts testified that the success rate ranges from 50 to 70 percent and that successful treatment is evidenced by survival of a patient for five years after commencement of treatment. Accordingly, defendant's departure from the standard of care during 1987 deprived Captain Edwards of a 60–percent chance that he would have survived until March of 1992.

**6**

### B. *Treatment During 1989*

On March 11, 1989, Captain Edwards began to experience constipation and back pain and took his complaints to the Rader Clinic. There, Dr. Jeanne Daly examined him, treated his constipation topically, and ordered x-rays. She examined them and detected no new abnormality. On March 12, at Dr. Daly's request, Captain Edwards delivered the Rader Clinic x-rays to radiologists Walter Reed. The Walter Reed radiologists inexplicably failed to read the x-rays. Sometime before May 12, Edwards himself picked up the x-rays and returned them to the Rader Clinic. They were finally read on that day by one Robert Riddick, a radiologist at the Rader Clinic. There is no evidence in the record of any contemporaneous report of Riddick's findings from reading the x-rays.

Meanwhile, Captain Edwards' condition had deteriorated. On April 21, he collapsed at home. Family members took him by ambulance, not to Walter Reed, but to Arlington Hospital nearby his home. Without benefit of the missing x-rays, Arlington Hospital personnel identified cord compression (a squeezing of the spinal cord) as the source of his recent symptoms and promptly performed a laminectomy of the fifth, sixth, and seventh thoracic vertebrae, along with a resection of the metastatic tumor. He subsequently underwent an orchiectomy (castration) and radiation therapy. When Captain Edwards was discharged from Arlington Hospital on June 1, 1989, he was unable to walk. He then moved into the home of his son Michael and began receiving some physical therapy. For a time Captain Edwards regained the ability to walk, first with a walker and then with a cane. He was hospitalized briefly again in August 1989 for another TURP procedure to treat his inability to urinate.

In September 1990, Captain Edwards' condition again began to deteriorate. He was readmitted to Arlington Hospital on September 20, 1990 with leg and back pain and weakness of the legs. Radiation therapy was planned, but his condition deteriorated further and Captain Edwards died on October 14, 1990.

There is essentially no dispute that the Walter Reed staff departed from the standard of care in failing to read the x-rays for seven weeks. Drs. Carabell, Daly, and Lynch testified that this failure to examine the x-rays was a breach of the standard of care. As these experts testified, the x-rays, if properly interpreted, would have revealed that the cancer had spread to the spine, resulting in widespread metastatic disease.

While none of the expert witnesses could say to a reasonable degree of medical certainty that the seven-month delay in reading the x-rays actually shortened Captain Edwards' lifespan to any significant degree, Dr. Carabell testified that a timely reading of the x-rays and immediate treatment would probably have obviated the need for spinal surgery, spared Captain Edwards some of his subsequent neurological deficits, and generally improved the quality of his last year of life. It is reasonable to conclude that some measure of increased pain and suffering proximately resulted from the deviation from the standard of care with regard to the delay in reading the x-rays.

\* \* \*

One final factual point: The plaintiffs, relying on the 1991 *Statistical Abstract* published by the U.S. Department of Commerce, posit a life expectancy of 9.1 years for Captain Edwards as of the spring of 1987. The life expectancy table relied on by plaintiffs, however, does not assume an individual diagnosed with a terminal disease such as cancer. In light of the fact that Captain Edwards had advanced, highly differentiated prostate cancer before he was seen by any of defendant's staff, the 9.1 statistical average for additional life is not a reasonable predicate for the calculation of damages.

### II. CONCLUSIONS OF LAW

The applicable legal standards are undisputed. Under both District of Columbia and Virginia law, the duty of care applicable in a medical malpractice case is "that degree of reasonable care and skill expected of members of the medical profession

under the same or similar circumstance." *Morrison v. MacNamara,* 407 A.2d 555, 561 (D.C.App.1979); *see also Brown,* 229 Va. at 531, 331 S.E.2d at 447. Contributory negligence on the part of a plaintiff could act as a defense to the defendant's liability. Contributory negligence is "the failure to act with the prudence demanded of an ordinary reasonable person under like circumstances." *Stager v. Schneider,* 494 A.2d 1307, 1311 (D.C.App.1985).

The plaintiff has established by a preponderance of the evidence: (1) the applicable standard of care owed to the plaintiff; (2) a deviation from or breach of that standard by the defendant; and (3) a causal relationship between that deviation or breach and the plaintiff's injury. *Ornoff v. Kuhn & Kogan Chartered,* 549 A.2d 728 (D.C.App. 1988); *Fitzgerald v. Manning,* 679 F.2d 341 (4th Cir.1982); *Brown v. Koulizakis,* 229 Va. 524, 331 S.E.2d 440 (1985). The defendant, in turn, has failed to carry its burden of proving by a preponderance of the evidence that plaintiffs' decedent was contributorily negligent.

As explained in the previous section of this Memorandum, the defendant departed from the standard of care in failing to communicate to Captain Edwards a consistent and understandable recommendation of treatment for his condition and to follow up on that treatment, and in failing to read the x-rays taken at Rader Clinic in a timely manner. The defendant's departure from the standard of care proximately caused some measure of the decedent's injury. In addition, the decedent was not contributorily negligent in failing to follow the advice of Dr. Bishop to receive radiation therapy or in failing to follow up on treatment of his prostate cancer.

Accordingly, the accompanying Order will declare that defendant is liable to the plaintiffs and that plaintiffs are entitled to recover from the defendant damages in an amount to be determined by agreement of the parties, or failing that, by the Court, after a further hearing.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 23d day of December, 1992, hereby

DECLARED: that defendant is liable to plaintiffs; and it is further

ORDERED: that counsel for the parties shall confer and attempt to agree on an amount of money which will fairly compensate plaintiffs for the damages proximately caused by defendant's negligence; and it is further

ORDERED: that the parties may, on or before *January 29, 1993,* file an appropriate proposed judgment and order which will reflect any agreement about the amount of defendant's liability, while preserving its right to appeal on the issue of liability *vel non;* and it is further

ORDERED: that, in the event that the parties file no proposed judgment and order by January 29, 1993, they shall attend a hearing on that date at 9:30 a.m. on the issue of damages.