Bernard L. SHORT and Marjorie Short

v.

UNITED STATES of America.

Civ. No. 1:93CV233.

United States District Court,
D. Vermont.

Nov. 27, 1995.

Thomas W. Costello, Brattleboro, VT, for plaintiffs.

Helen M. Toor, U.S. Attorney's Office, Burlington, VT, for defendant.

## MEMORANDUM OF DECISION

MURTHA, Chief Judge.

The plaintiffs, Bernard and Majorie Short, have brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674. They claim to have suffered damages as a result of the negligent failure of an internist at the Veterans Administration Hospital in White River Junction, Vermont (hereinafter the "VA Hospital") to diagnose Mr. Short's prostate cancer. On September 25, 26, 27 and 29, 1995, the Court conducted a bench trial in the instant matter. Upon consideration of the evidence presented at trial, after full review of the record before the Court, and for the reasons set forth *infra* pursuant to Fed. R.Civ.P. 52(a), judgment is entered in favor of the plaintiffs.

## I. FINDINGS OF FACT

### A.

The prostate is a partly muscular and partly glandular structure that surrounds the neck of the bladder and the urethra in the male. Resembling a chestnut, it consists of a median lobe and two lateral lobes. It is approximately $2 \times 4 \times 3$ cm large and weighs about 20 grams.

The prostate secrets a substance that forms part of the seminal fluid. *See* Trial Transcript Vol. I at 148 (hereinafter referred to as "Vol. —— at ——"). Upon digital examination, the "normal prostate" has the consistency of the tip of the nose. *See* Vol. III at 42.

After middle age, many men experience varying degrees of discomfort as a result of prostate enlargement. Among the conditions which may cause prostate problems are prostatitis, benign prostatic hyperplasia (hereinafter "BPH") and prostate cancer.

Prostatitis is an inflammation of the prostate gland. It is usually the result of a bacterial infection, although it may also be caused by a virus. *See* Vol. I at 150–51. Prostatitis or other urinary tract infections may be indicated by a sudden onset of symptoms such as in swelling, tenderness and pain in the prostate, dysuria, or ache or pain in the perineal area. *See* Vol. I at 152; Vol. IV at 18. Often a doctor can diagnose the condition by microscopically examining a urine sample for the presence of bacteria. *See* Vol. I. at 153. Treatment usually involves a course of antibiotics. Vol. I at 154.

BPH is another condition which commonly causes enlargement of the prostate gland in males over 50. It is a slowly-progressing condition and can cause obstruction of the urethra. BPH is a common reason for the onset of obstructive urinary flow symptoms

such as hesitancy, incontinence, weakness in the urinary stream, or nocturia. *See* Vol. I. at 155–56; Vol. II at 126. An individual with BPH may also exhibit irritative symptoms such as frequency, urgency, dysuria. *See* Vol. III at 40. On a digital rectal examination (hereinafter "DRE"), some, but not all, men show enlargement and general firmness of the prostate. *See* Vol. III at 41.

In the late 1980's, most physicians, particularly family practice physicians, internists, and urologists, became more aware of the problem of prostate cancer. *See* Vol. I at 146. For example, the American Cancer Society began a Prostate Cancer Awareness Week. *See* Vol. II at 116. Much of the information disseminated involved the use of the prostate specific antigen test, or PSA test, in conjunction with a DRE to diagnose the presence of prostate cancer. *See* Vol. I at 147.

Prostate cancer causes death in thousands of men annually. *See* Vol. II at 122, 127. By some estimates, approximately 30 percent of men over 50 may have latent prostatic cancers, most of which cause neither morbidity nor mortality. *See* Vol. II at 84, 95 (testimony of Dr. Fisher).

As an initial diagnostic procedure, physicians who are examining men complaining of prostate or urinary system problems conduct a DRE. During a DRE, the physician inserts a finger into the patient's anal canal to feel a portion of the prostate gland through the rectal wall. *See* Vol. I at 149. A doctor may detect hardness, irregularity, nodularity or asymmetry in part of the prostate's lobes. Such findings may indicate the presence of cancer.

All experts who testified agreed that a DRE is an inherently unreliable tool for detecting or ruling out the presence of prostate cancer. Moreover, practitioners often use vague and varying terms such as "hard," "soft," and "firm" to describe the same prostate. *See* Vol. II at 117; Vol. III at 39; Vol. IV at 19. Therefore, a desirable way to detect change in the prostate is for the same physician to perform several DRE's over time.

Any noticeable change in the prostate can provide a warning of a problem which needs attention. *See* Vol. II at 121. If a doctor finds a patient's DRE suspicious, he or she can take one of several courses. If certain that the patient's complaints suggest a benign condition with no urinary obstruction, he or she can recommend "watchful waiting," which involves monitoring a patient's condition over a period of time. *See* Vol. III at 45; Vol. IV at 24, 171. Watchful waiting is often the initial "treatment" elected by a person diagnosed with BPH. *See* Vol. III at 138. However, in the case where a primary-care physician is either unclear about the nature of the patient's condition or believes that prostate cancer is a potential diagnosis, he or she should either refer the patient to a urologist for diagnosis or order a PSA test to further assess the condition. *See generally* Vol. I at 155–62.

In 1991, the medical community was debating the appropriate use for the PSA test. The PSA test detects in the bloodstream traces of an antigen produced by the prostate under certain conditions, including when cancer may be present in the prostate. Most experts agree that a "normal" PSA level should be between 0 and 4 ng/ml. Recent research suggests that the chance of curing a cancer drops once the PSA level rises above 10 ng/ml. *See* Vol. IV at 67. However, each case is unique and a "low" PSA level does not guarantee a cure. *See* Vol. IV at 66.

The higher the PSA level, the more it suggests the presence of cancer. However, an elevated PSA level does not, in and of itself, indicate the presence of cancer. PBH or prostatitis may also cause elevated PSA levels. *See* Vol. II at 96; Vol. IV at 35. Accordingly, a definitive diagnosis can only be made after a biopsy and microscopic examination of prostate tissue samples. *See* Vol. II at 132.

Prostate cancer is often described in "stages." Stage "A" or "B" cancer is cancer which has not spread beyond the outer capsule of the prostate. Stage "C" cancer has spread beyond the outer capsule and stage "D" has metastasized to other organs. *See* Vol. III at 76.

Cancer cells also are graded using the "Gleason" scale. A tumor having a Gleason rating of 1 or 2 is described as well-differentiated or slow-growing. A Gleason rating of 8, 9 or 10 describes a cancer which is poorly-differentiated or very aggressive. *See* Vol. II at 126.

Some experts believe that stage A and B cancer can be cured by a radical prostatectomy, an operation in which the entire prostate gland is removed. *See* Vol. II at 82, 123; Vol. III at 119; Vol. IV at 142. Radical prostatectomy is most beneficial for individuals who are relatively young, i.e., who are expected to live at least 15 years. *See* Vol. II at 125; Vol. IV at 142. Such treatment carries a high risk of impotence, urinary incontinence, and in a small number of cases, death. *See* Vol. III at 74; *see also* Vol. IV at 77–78.

The growth rates of prostate cancer cells can vary. *See* Vol. II at 121. However, most agree that the earlier the stage a prostate cancer is detected, the more treatment options a patient has and the better the chance that his cancer can be suppressed or eliminated. *See* Vol. I. at 161 (Dr. Clarke); Vol. II at 155 (Dr. Daly); Vol. IV (Dr. Trotter). Experts disagree, however, on how to quantify the chance of survival attributable to early detection.

### B.

Plaintiff Bernard Short is a veteran entitled to receive medical care from the VA Hospital. He was born March 16, 1934. He is presently 61 years old. On October 10, 1991, he was 57 years old. *See generally* Vol. I at 36 *et seq.*

His wife, Marjorie Short is presently 57 years old. *See* Joint Pre–Hearing Memorandum of Stipulation of Issues of Fact (paper 47) (hereinafter "Stip. of Facts") at paras. 1–2.

At all times relevant to this matter, Dr. Elliott Fisher was an internist practicing at the VA Hospital. Stip. of Facts at para. 7. On January 10, 1991, Dr. Fisher examined Mr. Short to determine the cause of his complaints, which included a skin rash and bowel problems. *See* Vol. I at 70; Vol. II at 49.

At that time, however, Mr. Short had no urological complaints. Vol. I at 71; Vol. II at 54. Nevertheless, as part of the examination, Dr. Fisher performed a DRE on Mr. Short. Dr. Fisher noted that his prostate was "large but soft." Stip. of Facts at paras. 10–11; *see* Vol. I at 72; Vol. II at 66. At this visit, Dr. Fisher did not review Mr. Short's medical records and therefore did not know that Mr. Short had been seen by the VA on previous occasions. *See* Vol. II at 60.

As a result of the January 10, 1991 examination, Dr. Fisher referred Mr. Short for a dermatology consult. Stip. of Facts at para. 13. In addition, Dr. Fisher referred Mr. Short to a gastroenterologist for a sigmoidoscopy. *See* Vol. I at 73. On January 24, 1991, VA gastroenterologist Dr. James A. Doull performed the sigmoidoscopy and noted that Mr. Short's prostate was "firm, [and] moderately enlarged." Stip. of Facts at para. 12.

Mr. Short experienced the onset of urological symptoms in August or September of 1991. *See* Vol. I at 72, 76. Dr. Fisher again examined Mr. Short on October 10, 1991. Mr. Short described his symptoms as involving the frequency and amount of his urine flow, urgency, incontinence, nocturia and lack of ejaculation. *See* Stip. of Facts at 14; Vol. I at 77–78; Vol. IV at 16. Dr. Fisher performed another DRE on Mr. Short and noted that his prostate was "very firm, not irregular." He further noted: "Suspect BPH, doubt cancer/diabetes mellitus." Stip. of Facts at para. 15.

At that visit, Dr. Fisher did not obtain or review Mr. Short's VA medical records. *See* Vol. III at 126–27. Dr. Fisher also admits that he found Mr. Short's complaint of "decreased ejaculate" sufficiently unusual to require him to do research to determine the condition to which it might be related. *See* Vol. IV. at 31.

Without reviewing the notations of his past examination, Dr. Fisher preliminarily determined that Mr. Short's symptoms were consistent with BPH. *See* Vol. II at 72; Vol. IV at 24. However, he also considered the possibility of cancer and diabetes. *See* Vol. IV

at 45–46. Dr. Fisher ordered several tests for Mr. Short, including urinalysis, a complete blood count, and an ASTRA series to rule out diabetes. *See* Vol. II at 73. In addition, Dr. Fisher scheduled Mr. Short for another visit in six months. However, Dr. Fisher did not refer Mr. Short to a urologist, nor did he advise Mr. Short of the availability of a PSA test or recommend that he should have one. Stip. of Facts at paras. 15–17; *see* Vol. II at 74–75.

It is clear that, on October 10, 1991, Mr. Short was suffering from prostate cancer. Had Dr. Fisher either administered a PSA test or referred Mr. Short to a urologist, someone would have recognized that Mr. Short's prostate was cancerous and that he needed immediate treatment. *See, e.g.,* Vol. III at 112.

### C.

In addition to receiving medical care at the VA Hospital, Mr. Short occasionally received treatment from Dr. R. Keith Clarke, a family physician practicing in Brattleboro since 1960. *See* Vol. I at 139. On December 17, 1991, Mr. Short went to Dr. Clarke, complaining of flu-like symptoms. *See* Vol. I at 83–84. Mr. Short also complained of urological problems. Dr. Clarke treated his flu-like symptoms and suggested that Mr. Short consult with a urologist when he felt better. *See* Vol. I at 190. He also asked Mr. Short to have the VA Hospital send his records. Stip. of Facts at para. 18–19.

On January 2, 1992, Mr. Short sent a letter to the VA Hospital requesting copies of his medical records be sent to Dr. Clarke. The VA Hospital sent those records on January 17, 1992. Stip. of Facts at para. 20.

On February 6, 1992, Dr. Clarke examined Mr. Short for his urological problems. At that time, Dr. Clarke performed a DRE and noted that Mr. Short's prostate did not feel right. *See* Vol. I at 87. In his records, he noted the prostate was enlarged "3–4 plus" and "very firm." *See* Vol. I at 174. Dr. Clarke was concerned about ruling out cancer and immediately referred Mr. Short to Dr. John S.F. Daly, a Brattleboro urologist. Stip. of Facts at para. 21; *see generally* Vol. II at 104 *et seq.*

On February 12, 1992, Dr. Daly first examined Mr. Short and performed a DRE. Dr. Daly noted in his record: Mr. Short "is quite a heavy smoker and over the past six or seven months he has had increasing urinary frequency and urinary urgency, voiding in small amounts. . . . This he feels is a rather sudden change and about a year ago he had no problems at all. . . . [H]e had a hard, irregular enlarged prostate. I am very worried about this examination. I think that he has malignancy there." Stip. of Facts at para. 22; *see* Vol. II at 128.

Dr. Daly scheduled plaintiff for a PSA blood test, which was performed on February 18, 1992. When read, plaintiff's blood sample disclosed a PSA level of 83.5 ng/ml. Stip. of Facts at para. 22. On March 9, 1992, an ultrasound-guided biopsy confirmed that Mr. Short was suffering from prostate cancer. Specifically, the biopsy indicated that he had stage C cancer, moderately to poorly differentiated adenocarcinoma, Gleason score 8 with perineural invasion present on the right lobe and moderately differentiated adenocarcinoma on the left lobe. *See* Vol. II at 134.

On March 11, 1992, Mr. Short underwent a radionuclide bone scan, which disclosed no evidence that his prostate cancer had metastasized. Stip. of Facts at para. 23. Thereafter, on March 24, 1992, Dr. Daly performed a transurethral resection of the prostate (hereinafter "TURP") on Mr. Short to alleviate some of his urinary obstructive symptoms and to obtain more information about the location and stage of his cancer. *See* Vol. I. at 95. During the procedure, Dr. Daly took tissue samples which revealed that Mr. Short's cancer had spread beyond the prostate and had invaded the neck of his bladder. *See* Vol. II at 136. The pathologist who examined the specimens concluded that the cancer was Gleason Grade 7 cancer, moderate to poorly-differentiated. *See* Vol. III at 123.

Because the cancer had spread beyond the prostate, surgical removal of the prostate was no longer a viable treatment option. Accordingly, Dr. Daly recommended seven weeks of radiation therapy, with the hope of

eradicating Mr. Short's prostate cancer, as well as cancer cells which had spread to other locations. *See* Vol. I. at 97; Vol. II at 140.

On March 21, 1992, Mr. Short wrote a letter to the VA Hospital in which he questioned the quality of care he had received from Dr. Fisher and others at the VA. In response, VA Hospital Director Gary M. De-Gasta suggested that the record of Mr. Short's October 10, 1991 visit was "troublesome." He further wrote: "[S]ince cancer was raised but doubted as likely" and since the plaintiff "seemed to have progressive symptoms, . . . a PSA and referral to a urologist would have been an appropriate action on October 10, 1991." *See* Vol. I at 26; Plaintiff's Exhibit 1A.

From May 4, 1992 to June 25, 1992, Mr. Short received radiation treatment at the Kinsbury Center for Cancer Care in Keene, New Hampshire. Stip. of Facts at para. 24. Upon completion of this treatment, Mr. Short's PSA level temporarily went down as low as 17.7 ng/ml. Stip. of Facts at para. 25. After the TURP procedure and radiation treatments, the Shorts were unable to engage in normal marital relations. *See* Vol. I. at 102.

Soon, Mr. Short's PSA levels began to increase, thereby indicating that the radiation treatments had not eradicated his cancer. Because testosterone causes prostate cancer to grow, on September 7, 1993, Mr. Short underwent a bilateral orchiectomy, the surgical removal of his testicles. *See* Vol. II at 144.

The orchiectomy cannot cure Mr. Short's cancer; it will only serve to slow its growth for a period of time. *See* Vol. II at 148–49. As a result of the orchiectomy, Mr. Short's cancer is currently in remission. However, Mr. Short knows that, at some point, this hormonal control will cease to be effective. *See* Vol. I at 106.

Statistically, over 50 percent of individuals with stage B prostate cancer who are treated by radical prostatectomies will have cancer recur within five years. *See* Vol. IV at 111. Similarly, between 50 and 80 percent of men with stage C cancer who are treated with radiation will suffer metastases within 5 years. *See* Transcript Vol. II at 148; Transcript Vol. IV at 111.

In the instant case, Mr. Short's remission is expected to cease at some point within the next five years. In addition, Mr. Short was rendered permanently impotent. Stip. of Facts at para. 26–27. Both Mr. and Mrs. Short are emotionally distressed over Mr. Short's future prospects for cancer-free survival.

The testimony at trial included analysis to determine whether Mr. Short's cancer was organ-confined on October 10, 1991. Using Mr. Short's known PSA levels, several experts attempted to calculate the "doubling time," or rate of growth, of Mr. Short's cancer. Most cancers grow exponentially, depending upon the stage of the disease. *See* Vol. III. at 75. However, some individuals with particularly aggressive cancers may display a more accelerated growth rate. *See* Vol. IV at 93–94.

One of the Government's experts, Dr. Michael J. Barry, estimated that on October 10, 1991, Mr. Short's PSA level was probably in excess of 66 ng/ml, thereby indicating that, as of the date of his examination by Dr. Fisher, his cancer was already stage C. *See* Vol. III at 77–78. Accordingly, Dr. Barry believes there was only a five percent chance that Mr. Short's cancer was confined to his prostate on October 10, 1991. *See* Vol. III at 78; *see also* Vol. IV at 100–01.

Dr. Samuel J. Trotter is a urologic oncologist with Urology Associates in Burlington, Vermont. *See* Vol. IV at 55. Dr. Trotter testified that early prostate cancer produces no symptoms related to outlet obstruction. Accordingly, if in October, 1991, Mr. Short's symptoms were related to prostate cancer, then by definition his cancer would have been spread beyond the prostate. *See* Vol. IV at 64–65.

Dr. Trotter further testified that, because prostate cancer grows very slow, Mr. Short's cancer would have been present for a minimum of 10 years. *See* Vol. IV at 65. Dr. Trotter also testified that it is not possible for Mr. Short's prostate cancer to have gone from organ-confined to non-organ-confined in

4 months. *See* Vol. IV at 66. Therefore, Dr. Trotter also believes an early diagnosis of Mr. Short's cancer would have made *no difference* in the ultimate progression of his disease. *See* Vol. IV at 63, 118.

By contrast, given the swift doubling-time Mr. Short's aggressive cancer suggests, Dr. Daly found the doubling time of Mr. Short's cancer was approximately every 2.86 months. Using this figure, Dr. Daly calculated Short's PSA level would have been below 30 on October 10, 1991. *See* Vol. IV at 125–26.

Taken as a whole, the credible testimony indicates that, with a PSA level below 30, there is a chance that Mr. Short's cancer was organ-confined and could have been successfully treated with a combination of radical prostatectomy and radiation. *See* Vol. IV at 84–85. Had the option been available, Mr. Short would have chosen to undergo a radical prostatectomy, thereby increasing the chances of retaining his sexual potency and survival. *See* Vol. IV at 155–56.

After October 10, 1991, the Shorts incurred medical costs totaling over $40,000. *See* Stip. of Facts at paras. 20–31. Mr. Short's prescription medication currently costs approximately $300 per month. *See* Vol I. at 111. In the future, Mr. Short will continue to require medication, doctors visits and eventually hospitalization and treatment for his cancer. *See* Vol. I at 116. Had he sought treatment at the VA Hospital, all Mr. Short's treatment would have been provided without charge. Mr. Short has CHAMPUS insurance, which will pay up to 75 percent of these medical expenses. Stip of Facts at para. 32.

Between 1987 and 1992, Mr. Short earned an average of $13,729 per year before taxes. *See* Stip. of Facts at para. 34. However, fatigue, stress and physical problems have left Mr. Short unable to work as long or as vigorously as he did before his diagnosis. Because Mr. Short is only able to work part-time, Mrs. Short has had to take a part-time job working nights cleaning offices to supplement the couple's income. *See* Vol. I. at 60–61.

The average life expectancy for a white male presently 61 years old is 77 years.

Stip. of Facts at para. 3. However, Mr. Short smoked between one and two packs of cigarettes for over twenty years, and therefore has a shortened life expectancy apart from that attributable to his prostate cancer. *See* Stip. of Facts at para. 5; Vol. IV at 14. For example, a heavy smoker at age 55 has a 45 percent chance of dying within 15 years, whereas a non-smoker has less than a 20 percent chance. *See* Vol. IV at 164–65.

### D.

Several witnesses testified regarding the appropriate standard of care. Because both internists and family practice physicians are primary care physicians, there are many similarities between their practices. *See* Vol. III at 3. Therefore, Drs. Clarke and Barry presented the most relevant testimony on the appropriate standard of care. *See Milano by Milano v. Freed,* 64 F.3d 91, 97 (2d Cir.1995) (pediatric neurologist not competent to testify about practice of radiology); *Cronkrite v. Fahrbach,* 853 F.Supp. 257, 261 (W.D.Mich. 1994) (orthopedic surgery not a related, relevant area of medicine to family practice).

Dr. Clarke testified that, in 1991, a doctor presented with a patient (1) in his 50's, (2) with obstructive urinary flow problems, (3) manifested within last nine months, and (4) a firm prostate on DRE examination, should be concerned about prostate cancer. *See* Vol. I at 158–59. In addition, a primary care physician with such a patient should consider ordering a PSA test. In any event, whether the patient is suspected to have cancer or BPH, that patient should be assessed by a urologist. *See* Vol. I. at 159–60. Moreover, in Dr. Clarke's opinion, it is a breach of the standard of care to simply schedule such a patient for another visit in six months. *See* Vol. I at 161.

Dr. Barry is an internist employed by Massachusetts General Hospital in Boston. *See* Vol. III at 30. Upon his review of Mr. Short's medical records, Dr. Barry concluded that Dr. Fisher rendered Mr. Short appropriate care for the year 1991. *See* Vol. III at 36.

In support of his conclusion, Dr. Barry opined that it would be impossible to refer every male over 50 who is diagnosed with

BPH to a urologist; therefore, Dr. Fisher's clinical judgment that a referral of Mr. Short was unnecessary did not violate the standard of care in effect in 1991. *See* Vol. III at 60, 62–63. Moreover, in 1991, PSA testing had only been approved by the Food and Drug Administration for the monitoring of patients already diagnosed with prostate cancer. *See* Vol. III at 61. He further noted that the American Cancer Society did not advocate routine PSA testing until 1993. *See* Vol. III at 58–59; *but see* Vol. III at 108 (On cross-examination, Dr. Barry admits it would also have been reasonable to order a PSA test in 1991.)

Finally, Dr. Barry opined that a diagnosis of Mr. Short's cancer in October, 1991 would not have materially increased his probability of curability. *See* Vol. III at 70–71. He cited studies which suggest that, even if confined to the prostate gland, there is at least a 25 percent chance of the cancer recurring after 5 years after performance of a radical prostatectomy. *See* Vol. III. at 73.

The Government's other expert on the standard of care was Dr. Paul J. Reiss, a family practice physician currently employed by Community Health Plan in Vermont. *See* Vol. IV at 157–58. Dr. Reiss echoed many of Dr. Barry's conclusions. *See, e.g.,* Vol. IV at 177. Specifically, in 1991, Dr. Reiss did not routinely order PSA tests, nor did he automatically refer men with BPH to a urologist. *See* Vol. IV at 178.

In contrast, Dr. Daly testified that, in his experience, most family practice doctors and internists knew that the use of both a DRE and PSA test were important. In addition, many primary care physicians would refer the results of these tests to him for interpretation. *See* Vol. II at 114. In this particular case, Dr. Daly suggested that, given the indication in Dr. Fisher's notes that Mr. Short's prostate had gone from "soft" to "very firm" within a ten month period, Dr. Fisher's instruction to return in six months was not adequate care. *See* Vol. II at 152.

## II. CONCLUSIONS OF LAW

While set forth in six counts, the plaintiffs' complaint essentially alleges causes of action based on negligence, lack of informed con-

sent, and loss of consortium. Under the Federal Tort Claims Act, Vermont law governs resolution of this case. *See* 28 U.S.C. § 1346(b). Vermont provides two statutory bases for imposing liability for medical malpractice, 12 V.S.A. § 1908 and 12 V.S.A. § 1909.

### A. Negligence

In relevant part, 12 V.S.A. § 1908 provides:

For the purpose of this section, malpractice shall mean professional medical negligence comprised of the elements listed herein. In a malpractice action based on the negligence of the personnel of a hospital, [or] physician licensed under chapter 23 of Title 26, ... the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont.

(2) That the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

■ In Vermont, a physician is not required to be infallible. *Utzler v. Medical Center Hospital of Vermont,* 149 Vt. 126, 540 A.2d 652, 653 (1987). A bad medical result does not automatically require the Court to find a breach of the standard of care. *Lockwood v. Lord,* —— Vt. ——, 657 A.2d 555, 558 (1994).

■ The Government asserts no violation of the standard of care has occurred and, in any event, the plaintiffs have suffered no injury as a result of the conduct of the VA Hospital or any of its employees. The Government further argues that Mr. Short has not established with a sufficient degree of certainty that, as of October 10, 1991, his

cancer had not spread outside the prostate gland. Accordingly, there is no credible evidence that a radical prostatectomy performed in October, 1991 would have cured Mr. Short or in any way changed the course of his disease.

The plaintiffs rely on the letter sent by Mr. DeGasta as proof of the VA's negligence. As an initial matter, the Court notes that statements such as those in the DeGasta letter are insufficient to prove that Dr. Fisher breached the applicable standard of care. *See, e.g., Phinney v. Vinson,* 158 Vt. 646, 605 A.2d 849, 850 (1992); *Senesac v. Associates in Obstetrics and Gynecology,* 141 Vt. 310, 449 A.2d 900, 903 (1982).

However, "[s]ection 1908(1) imposes an *objective* standard, and measures the defendant doctor's conduct against what a reasonable doctor would have done in the same or similar circumstances." *Rooney v. Medical Center Hospital of Vermont,* 162 Vt. 513, 649 A.2d 756, 760 (1994) (emphasis in original). Given the undisputed fact that it is difficult to diagnose prostate problems, Dr. Fisher's erroneous diagnosis, in and of itself, does not provide a basis for imposing liability. Objectively viewed, however, the credible evidence before the Court demonstrates that Dr. Fisher violated the applicable standard of care in several other important respects.

At a minimum, the applicable standard of care on October 10, 1991 required Dr. Fisher to review the VA's records of Mr. Short's past medical visits before examining him. Had he done that, there is a substantial likelihood that his own notes would have alerted him to changes in the condition of Mr. Short's prostate between January and October, 1991. In this regard, the Court does not credit Dr. Fisher's testimony that his different notations in January and October of 1991 would not have alerted him to a potential problem. The fact that different doctors describe the condition of the prostate by using different terms only reinforces the importance of a physician reviewing his own prior notes concerning his impressions of a patient's prior DRE. *See* Vol. II at 117.

In addition, the Court credits Dr. Clarke's testimony that, when a patient of Mr. Short's age presents substantial urological symptoms, a primary care physician in 1991, at the very least, should have referred him to a urologist for further diagnosis or ordered a PSA test. *See* Vol. I at 159–60. Here, Dr. Fisher knew that prostate cancer is likely to be present in men over 50. *See* Vol. II at 84, 95. Dr. Fisher also admitted that he did not know what to make of Mr. Short's lack of ejaculate. This further supports the conclusion that he should have referred Mr. Short to a urologist or ordered a PSA test which was readily available at the VA hospital.

██ As discussed *supra,* the Government has argued Mr. Short cannot prove causation because he already had cancer at the time Dr. Fisher failed to diagnose his condition. To counter this argument, the plaintiffs have urged this Court to adopt the "loss of chance doctrine," a theory of causation which apparently has yet to be adopted by any Vermont state court.

"An evolving trend has developed to relax the standard for sufficiency of proof of causation ordinarily required of a plaintiff to provide a basis upon which the jury may consider causation in the 'lost chance of survival' cases." *McKellips v. Saint Francis Hospital, Inc.,* 741 P.2d 467, 471 (Okl.1987). Courts typically apply this theory where a plaintiff already has a condition and claims that negligence has increased his risk of harm by hastening or aggravating the effect of his preexisting condition. *Id.*

Courts have explained the legal basis for the loss of chance doctrine in several ways. *Id.* Some jurisdictions have adopted the doctrine in terms of a breach of duty and implied causation imposed by § 323 of the Restatement (Second) of Torts. *See, e.g., id.* at 472, n. 19. In relevant part, § 323 provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if (a) his failure to exercise such care increases the risk of such harm. . . .

This approach ensures that the most ill patients will not automatically be deemed unable to prove proximate causation. *See Scafidi v. Seiler,* 119 N.J. 93, 574 A.2d 398, 403 (1990); *see also Delaney v. Cade,* 255 Kan. 199, 203, 873 P.2d 175, 178 (1994) ("The loss of chance theory arises in medical malpractice cases wherein the patient is suffering a preexisting injury or illness which is aggravated by the alleged negligence of the doctor or health care provider to the extent that the patient dies, when without negligence there might have been a substantial chance of survival or the actual recovery is substantially less than it might have been absent the alleged malpractice.") As the *McKellips* court explained:

We think in those situations where a health care provider deprives a patient of a significant chance for recovery by negligently failing to provide medical treatment, the health care professional should not be allowed to come in after the fact and allege that the result was inevitable inasmuch as that person put the patient's chance beyond the possibility of realization. Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow care providers to evade liability for their negligent actions or inactions in situations in which patients would not necessarily have survived or recovered, but still would have a significant chance of survival or recovery.

741 P.2d at 474.

The Vermont Supreme Court has suggested it is appropriate to consider increased-risk-of-harm when determining whether a physician's treatment is the proximate cause of a plaintiff's harm. *See Lockwood v. Lord,* 657 A.2d at 560. In addition, in other contexts, the Vermont Supreme Court has relied upon theories consistent with the one set forth in the Restatement (Second) of Torts § 323. *See Smyth v. Twin State Improvement Corp.,* 116 Vt. 569, 570–71, 80 A.2d 664, 665 (1951) ("[T]he law imposes an obligation upon everyone who attempts to do anything for another, even gratuitously, to exercise some degree of care and skill in the performance of what he has undertaken, for non-

performance of which duty an action lies."); *see also Sabia v. State of Vermont,* —— Vt. ——, 669 A.2d 1187 (1995); *Derosia v. Liberty Mutual Insurance Co.,* 155 Vt. 178, 583 A.2d 881, 883 (1990). Accordingly, this Court predicts that, given the opportunity, the Vermont Supreme Court would apply the loss of chance doctrine in a case where a plaintiff alleges the negligent failure to diagnose.

The Court finds that Dr. Fisher's negligence deprived Mr. Short of a significant chance for recovery and that, under the loss of a chance doctrine, his failure to diagnose is a proximate cause of Mr. Short's harm. *See infra* at Section II D. It is undisputed that Mr. Short had prostate cancer on October 10, 1991. This Court credits the testimony which suggests that, had Dr. Fisher either performed a PSA test or made a referral to a urologist on that date, there is a significant chance that Mr. Short's cancer would have been organ-confined and, therefore, could have been cured by radiation or radical prostatectomy.

As a result of the late diagnosis, Mr. Short has suffered damages including castration, diminished earning capacity, and shortened life expectancy. Moreover, both Mr. and Mrs. Short have experienced emotional distress and suffering attendant to Mr. Short's cancer treatment and their awareness of his shortened life expectancy.

### B. Informed Consent

In relevant part, 12 V.S.A. § 1909 provides:

(a) For the purpose of this section "lack of informed consent" means:

(1) The failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation;

(c) It shall be a defense to any action for medical malpractice based upon an alleged

failure to obtain such an informed consent that:

.    .    .    .    .

(4) A reasonably prudent person in the patient's position would have undergone the treatment or diagnosis if he had been fully informed.

■ A prerequisite to liability under § 1909 is a finding that a reasonable patient would not have given consent to the medical procedure had he fully known of the risks. *Begin v. Richmond,* 150 Vt. 517, 555 A.2d 363, 367 (1988). However, the Court does not interpret § 1909 as imposing on a physician a general duty to inform a patient of each and every possible risk or treatment. *See McGeshick v. Choucair,* 9 F.3d 1229, 1234–35 (7th Cir.1993) (interpreting Michigan law).

■ The Court concludes that a reasonable patient presented with Dr. Fisher's preliminary diagnosis of BPH would have chosen watchful waiting. Moreover, in 1991, practitioners varied in their practice of using and informing patients of the availability of PSA tests. Therefore, the Court is unable to find the defendant liable under the Vermont informed consent statute. *Cf. Rooney,* 649 A.2d at 761 ("Any course of conduct, regardless of its efficacy or the availability of other options, which is in accordance with the applicable standard of care is not negligence.")

### C.  Loss of Consortium

■ The Vermont Supreme Court has "long ago recognized that the action for loss of consortium is directed to the loss of affection, aid and cooperation in every conjugal relation, and conjugal society, as well as any pecuniary loss that might occur." *Whitney v. Fisher,* 138 Vt. 468, 417 A.2d 934, 936 (1980). "Sexual relations [, however,] are but one element of the spouse's consortium action. The other elements—love, companionship, affection, society, comfort, services and solace— ... are deserving of protection." *Hay v. Medical Center Hospital of Vermont,* 145 Vt. 533, 496 A.2d 939, 942 (1985) (quoting *Berger v. Weber,* 411 Mich. 1, 14, 303 N.W.2d 424, 426 (1981)). Because the Court has found that the defendant's negligence is the proximate cause of Mr. Short's injuries, including his inability to engage in marital relations and his distress over his current condition and diminished life expectancy, Mrs. Short is entitled to recover damages attributable to her loss of consortium. *Hay,* 496 A.2d at 942.

### D.  Damages

■ Where, as here, a plaintiff has relied upon the loss of chance doctrine, courts have identified three ways to apportion damages. *See Boody v. United States,* 706 F.Supp. 1458, 1465 (D.Kan.1989). One option is for the trier of fact to simply award a compensation figure based upon its assessment of all the evidence. A second method would permit the trier to award full compensation for the loss, regardless of the fact that the plaintiff may have had less than an even chance of survival or cure. Lastly, the trier may attempt to approximate percentage chance of living or surviving for a fixed period of time and award the plaintiff for the percent chance that was lost. *Id.*

This Court predicts the Vermont Supreme Court would adopt a "proportional damage approach" as the most logical approach to compensate a plaintiff for what he or she actually lost: "the approximate percentage chance of living for a fixed period of time." *Id.; accord Delaney v. Cade,* 255 Kan. at 218, 873 P.2d at 187. "Under the proportional damage approach, the amount recoverable equals the total sum of damages ordinarily recovered for the underlying injury or death multiplied by the percentage of lost chance." *Delaney v. Cade,* 255 Kan. at 218, 873 P.2d at 187. The Court believes the Vermont Supreme Court would find this method of computing damaged preferable because: (1) It does not overcompensate the plaintiff or unjustly burden the defendant with damages which are not attributable to fault; and (2) it provides the trier of fact with guidance on how to measure the damages. *See Boody,* 706 F.Supp. at 1465–66.

Using this method, the Court first must compute a gross damages figure. In the instant case, this figure includes lost wages, pain and suffering, compensation for undergoing an orchiectomy, and unreimbursed

medical expenses. This gross figure is then reduced to reflect compensation only for the "chance" actually lost. *See McKellips,* 741 P.2d at 476 (The amount of damages recoverable is computed by multiplying the total damages ordinarily allowed in a wrongful death action by the percent of chance lost.)

### 1.

▇▇▇ As of October, 1991, Mr. Short's theoretical life expectancy was 77 years old, or approximately 20 more years. However, in this case, life expectancy tables alone do not provide a reasonable basis for the calculation of damages because those figures do not assume either a long-time smoker or an individual who has already been diagnosed with prostate cancer. *See Esfandiari v. United States,* 810 F.Supp. 1, 6 (D.D.C.1992). Therefore, due to the fact that Mr. Short is a long-time smoker and, on the date of the negligence, he already had cancer, the Court reduces Mr. Short's theoretical life expectancy to 15 years.

Based on the testimony of plaintiffs' economic expert, John Meyer, the Court awards Mr. Short $88,067 in lost wages. *See* Plaintiffs' Exhibit 151.

The Court further awards Mr. Short $150,-000 for pain and suffering attributable to factors such as the orchiectomy, fatigue he has experienced, the impairment of his ability to engage in marital relations, and, in general, the mental and emotional suffering he has endured as a result of the negligent delay in diagnosing his cancer.

▇▇▇ The Court also makes a gross award of $197,000 in medical expenses. This figure includes $43,000 in expenses incurred, $54,-000 in future expenses for prescription medication ($3600 per year multiplied by 15 years) and $100,000 attributable to future doctor visits and hospitalizations. However, this figure must be reduced by 75 percent, the amount the plaintiffs have or will have received from CHAMPUS, to a total of $49,-250 for their out-of-pocket medical expenses. *See Mays v. United States,* 806 F.2d 976 (10th Cir.1986), *cert. denied,* 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987); *Lozada v. United States,* 140 F.R.D. 404 (D.Neb.

1991), *aff'd,* 974 F.2d 986 (8th Cir.1992). Accordingly, the Court calculates Mr. Short's gross damages as $287,317.

### 2.

▇▇▇ "To the extent that a plaintiff's ultimate harm may have occurred solely by virtue of a preexisting condition, without regard to a tortfeasor's intervening negligence, the defendant's liability for damages should be adjusted to reflect the likelihood of that outcome." *Scafidi,* 574 A.2d at 408. Therefore, the Court must determine the percentage of his total life expectancy which Mr. Short will lose as a result of Dr. Fisher's negligence. *See Boody,* 706 F.Supp. at 1466–67. Stated another way, "[a]fter consideration of the statistical evidence of the original and diminished chance of survival presented by both sides as well as other factors which are peculiar to the individual decedent, the [trier of fact] should select from the figures presented or choose appropriate figures to find the percentage of original chance of survival in [the] absence of negligence and the percentage of diminished chance resulting from the defendant's negligence in order to determine the net reduced figure." *McKellips,* 741 P.2d at 476.

Here, the most credible testimony suggests that, had Mr. Short's prostate cancer been promptly diagnosed at stage B, he would have had a 50 percent chance of being cancer-free in five years. However, that chance was reduced to between 50 and 80 percent as a result of his being diagnosed at stage C. Therefore, the Court finds Mr. Short's lost chance is 30 percent (80 percent minus 50 percent), making the final total award of damages for Mr. Short $86,195 ($287,317 multiplied by 30 percent).

### 3.

▇▇▇ Regarding Mrs. Short loss of consortium claim, the Court will award Mrs. Short $80,000 for loss of companionship and marital relations, and the accompanying hardship and distress she will personally suffer. However, even if her husband's cancer had been diagnosed on October 10, 1991, Mrs. Short would have suffered many of the same damages. Accordingly, the Court will reduce her

award using the same 30 percent figure, to a total of $24,000.

### III.  Conclusion

The Court finds for Bernard Short in the amount of $86,195 and for Marjorie Short in the amount of $24,000.  The Clerk of the Court is hereby directed to enter judgment in favor of the plaintiffs in those amounts.