*Wissell v. Fletcher Allen Health Care, Inc.*, No. 232-2-12 Cncv (Grearson, J., May 22, 2014)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| Chittenden Unit | Docket No. 232-2-12 Cncv |

**HEATHER WISSELL**, Individually, and as
Administratrix for the Estate of Dylan M. Wissell
      Plaintiff


    v.


**FLETCHER ALLEN HEALTH CARE, INC.**
      Defendant


## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Heather Wissell brought a medical malpractice action against Defendant Fletcher Allen Health Care ("FAHC") after her son, Dylan Wissell, died as a result of complications from a surgical procedure. The sole remaining claim is based on lack of informed consent, pursuant to 12 V.S.A. § 1909. Plaintiff claims that Defendant failed to provide informed consent prior to the surgery under two separate provisions of the statute. Plaintiff alleges that Dr. Joseph Schmoker, who performed the surgery at FAHC, (1) failed to disclose the alternatives to the surgery and the reasonably foreseeable risks and benefits involved in a manner permitting Dylan to make a knowledgeable evaluation pursuant to 12 V.S.A. § 1909(a)(1); and (2) failed to provide a reasonable answer to a request for information pursuant to § 1909(d). Plaintiff is represented by Thomas Sherrer, Esq., and Defendant is represented by S. Crocker Bennett II, Esq. Defendant has moved for summary judgment pursuant to Vermont Rule of Civil Procedure 56. For the reasons stated below, Defendant's motion for summary judgment is denied.

### STANDARD FOR SUMMARY JUDGMENT

In addressing a motion for summary judgment, the Court derives the undisputed facts from the parties' statements of fact under V.R.C.P. 56(c). Facts in the moving party's statement are deemed undisputed when supported by the record and not controverted by facts in the nonmoving party's statement. *Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 29, 175 Vt. 413 (quoting *Richart v. Jackson*, 171 Vt. 94, 97 (2000)).

Summary judgment under V.R.C.P. 56 is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Guiel v. Allstate Ins. Co.*, 170 Vt. 464, 467 (2000). "A fact is material when it affects the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Howard Opera House Assocs. v. Urban Outfitters*, 166 F. Supp. 2d 917, 926 (D. Vt. 2001). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining if there is a genuine issue as to any material fact, the Court "will accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 15, 176 Vt. 356, 362–63. The Court will also "give the nonmoving party the benefit of all reasonable doubts and inferences." *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 8, 177 Vt. 215 (quoting *Chamberlain v. Metro. Prop. & Cas. Ins. Co.*, 171 Vt. 513, 514 (2000) (mem.)). However, the nonmoving party may not "rely on bare allegations alone to meet the burden of demonstrating a disputed issue of fact." *Webb v. Leclair*, 2007 VT 65, ¶ 14, 182 Vt. 559 (mem.). Facts discussed herein are therefore deemed to be undisputed, except as noted or otherwise qualified.

## FACTS

This action is brought by plaintiff Heather Wissell, Dylan's mother and personal representative. Plaintiff initially alleged two counts of negligence: (1) lack of informed consent pursuant to 12 V.S.A. § 1909; and (2) negligence in the performance of the surgery and/or postoperative treatment pursuant to 12 V.S.A. § 1908. Compl. 5–6 (filed Feb. 27, 2012); First Am. Compl. 5–6 (filed May 24, 2012). Plaintiff moved for voluntary dismissal of her § 1908 claim, which the Court granted on September 23, 2013. Hence, the only remaining claim is for medical malpractice based on lack of informed consent pursuant to § 1909.

In December 2009, Plaintiff's son Dylan Wissell was a 19 year old male who suffered from a heart defect, "aortic insufficiency with bicuspid aoritic valve." Pl.'s Stmt. of Disputed Mat. Facts ("PSMF") ¶ 1; Def.'s Stmt. of Undisputed Mat. Facts ("DSMF") ¶ 1. On February 16, 2010, Dylan underwent an aortic valve surgery known as the "Ross Procedure." DSMF ¶ 1. The procedure was performed by cardiothoracic surgeon Joseph Schmoker, M.D. at Fletcher Allen Hospital in Burlington, Vermont. DSMF ¶ 1. Dylan died on February 28, 2010 as a result of a surgery-related complication (bleeding along the pulmonary autograft suture line). DSMF ¶ 1.

During the period leading up to and during the surgery, Dylan was under the care and treatment of David Stifler, M.D., a general practitioner; Adam Kunin, M.D., a cardiologist; and Dr. Schmoker, a cardiothoracic surgeon. PSMF ¶ 1. Dylan was originally scheduled to undergo surgery in October 2009, but changed his mind and cancelled that surgery, apparently because he "did not feel . . . ready to undergo the procedure yet." PSMF ¶ 1; Letter from Dr. Kunin to Dr. Stifler with CC to Dr. Schmoker 1 (Dec. 16, 2009) (on file with Court as Ex. 1 to PSMF) (hereinafter "Letter from Dr. Kunin"). At that time, Dylan's condition remained "essentially asymptomatic," and future plans involved Dr. Kunin seeing him again in six months for further testing. PSMF ¶ 1; Letter from Dr. Kunin 1–2 (Ex. 1 to PSMF). Dr. Kunin's recommendation was that Dylan was indeed ready for surgery, but that the option of delaying the surgery was "certainly a viable second choice option" and not an "absolutely wrong strategy." PSMF ¶ 1; Letter from Dr. Kunin 2 (Ex. 1 to PSMF).

Dylan eventually elected to go ahead with the surgery, and he and his mother met with Dr. Schmoker for a preoperative visit on February 10, 2010. PSMF ¶ 2; Letter from Dr. Schmoker to Dr. Stifler with CC to Dr. Kunin (Feb. 10, 2010) (Ex. 2 to PSMF) (hereinafter "Letter from Dr. Schmoker"). Dylan remained very anxious about the procedure and asked for an

increase in "clonazepam," which was declined by Dr. Schmoker. PSMF ¶ 2; Letter from Dr. Schmoker (Ex. 2 to PSMF). During this meeting, Dr. Schmoker discussed Dylan's surgical options with both Dylan and his mother. PSMF ¶ 2; Letter from Dr. Schmoker (Ex. 2 to PSMF). Dylan's mother (Plaintiff) was present with Dylan during his preoperative visits with Dr. Schmoker and did most of the talking with Dr. Schmoker. PSMF ¶ 5; DSMF ¶ 3. It was determined that a pulmonary autograft replacement of Dylan's aortic valve with placement of a pulmonary homograft in the pulmonary outflow tract (Ross Procedure) was the most likely option, and that the option of an aortic valve sparing root replacement was unlikely because of the severity of Dylan's bicuspid valve, but that this would need to be determined at the time of operation. Letter from Dr. Schmoker (Ex. 2 to PSMF).

Dr. Schmoker explained to Dylan and Plaintiff that the Ross Procedure presented a risk of major complications including bleeding, myocardial infarction, renal failure, and death, and that the risk of such major complications was one to two percent. DSMF ¶ 8; PSMF ¶ 2; Deposition of Joseph Schmoker 45–46 (Jan. 17, 2013) (on file with Court as Ex. C to DSMF); Deposition of Heather Wissell 115–16, 142 (May 15, 2013) (Ex. E to DSMF). Dr. Schmoker also told Dylan and Plaintiff that the risk presented by the surgical options other than the Ross Procedure (i.e., mechanical or bioprosthetic valve) was at most one percent. Deposition of Joseph Schmoker 46–47 (Ex. 8 to PSMF); PSMF ¶ 10. Dr. Schmoker testified in deposition that Dylan and his mother struggled with whether to have the surgical procedure and which surgical procedure to have. Deposition of Joseph Schmoker 47 (Ex. 8 to PSMF).

Plaintiff's liability expert, Dr. Paul Stelzer, testified that it would have been reasonable to quantify Dylan's risk of all major complications (fatal and non-fatal) as five percent, but not lower. DSMF ¶ 9; Deposition of Paul Stelzer 107–08 (Ex. B to DSMF). Dr. Stelzer indicated that one to two percent was an accurate mortality rate, but not an accurate quantification of all major fatal *and non-fatal* complications. DSMF ¶ 9; Deposition of Paul Stelzer 107–08 (Ex. B to DSMF).

Also during a preoperative visit, Plaintiff asked Dr. Schmoker about his experience with the Ross Procedure.[1] Dr. Schmoker responded that he was "very experienced":

> Q. Can you remember any questions that you asked Dr. Schmoker?
> A. Yes.
> Q. What did you ask him?
> A. I asked him what his experience was doing the Ross procedure?
> Q. What did he tell you?
> A. Dr. Schmoker told me that he was very experienced in doing the Ross procedure and that we didn't need to worry about that.
> Q. That's his exact language?
> A. Yeah, exact.

---

[1] Although Defendant does not necessarily admit that Plaintiff asked Dr. Schmoker a "question about Dr. Schmoker's experience with the Ross Procedure," DSMF ¶ 4, Plaintiff has submitted evidence supporting this fact. *See* PSMF ¶ 6; Deposition of Heather Wissell 112 (May 15, 2013) (on file with Court as Ex. 6 to PSMF). Therefore, the Court will accept this allegation as true for the purposes of this motion. *See Robertson*, 2004 VT 15, ¶ 15.

Deposition of Heather Wissell 112 (May 15, 2013) (on file with Court as Ex. E to DSMF).[2] Neither Plaintiff nor Dylan asked any further questions as to the number of procedures Dr. Schmoker had performed, Dr. Schmoker's statistical success/complication rates, whether there were other surgeons more experienced than Dr. Schmoker in the procedure, and whether there were other regional medical facilities better equipped than Fletcher Allen to accommodate Ross Procedure patients. DSMF ¶¶ 4, 6.

At the time of Dylan's surgery, Dr. Schmoker had previously performed a total of nine Ross Procedures at Fletcher Allen since 2004, two of which had resulted in complications.[3] PSMF ¶ 7; DSMF ¶ 5 n.1. One complication involved a "small embolus" to the patient's retinal artery, causing a "very minor visual field defect," meaning a "loss of sight in . . . part of his peripheral vision." Deposition of Joseph Schmoker 28 (on file with Court as Ex. 8 to PSMF). The second complication involved the patient developing a "Dressler's Syndrome, which is a post-inflammatory syndrome with fluid buildup in the lungs and around the heart," which "required drainage of fluid and treatment with anti-inflammatory medications." *Id.* This information about Dr. Schmoker's previous Ross Procedures—including the number of Ross Procedures Dr. Schmoker had performed and the fact of the two complications—was not communicated to Plaintiff or Dylan before Dylan's surgery. PSMF ¶ 7; Deposition of Heather Wissell 209–10 (on file with Court as Ex. 6 to PSMF).

Plaintiff's liability expert opines that, regarding the Ross Procedure, "there is a direct relationship between risks and the amount of experience of the individual surgeon," and that any representation that Dr. Schmoker was "very experienced" or even "experienced" would be a "misrepresentation of his experience with the Ross Procedure. Affidavit of Paul Stelzer ¶¶ 8, 10 (on file with Court as Ex. 4 to Pl.'s Resp. to Def.'s Mot. For Summ. J. ("PR")). Although Dr. Stelzer did not offer an opinion as to whether Dr. Schmoker deviated from the standard of care in performing the Ross Procedure on Dylan, he opined that Dr. Schmoker's performance "did reflect his lack of experience with the procedure," noting that the stitch spacing was inadequate, the procedure was completed in less time than it normally takes an "experienced" surgeon to perform, and that Dr. Schmoker failed to follow up on a "questionable x-ray" and order an echocardiogram that "may very well have identified the bleeding prior to Dylan's discharge." *Id.* ¶ 11. Dr. Stelzer also offered his opinion that the Ross Procedure was indeed the "best option" for Dylan, and that Dr. Schmoker was capable and qualified to perform the Ross Procedure. DSMF ¶¶ 10–11. According to Dr. Stelzer, Dr. Schmoker's training was "as good as you could get, at that point in time." *Id.* ¶ 11.

---

[2] Although Defendant denies that Dr. Schmoker responded that he was "very experienced," Defendant is willing to stipulate to that fact for the purposes of this motion only. Def.'s Mot. Summ. J. 7 n.5.

[3] Defendant contends that this figure does not include several Ross Procedures that Dr. Schmoker performed during his fellowship. DSMF ¶ 5 n.1. Dr. Schmoker's deposition testimony indicates that he performed six Ross Procedures himself while in training between 1995 and 1998, and that he also assisted on at least four Ross Procedures during this period. Deposition of Joseph Schmoker, M.D. 7–13 (Jan. 17, 2013) (on file with Court as Ex. 8 to PSMF).

## CONCLUSIONS OF LAW

Vermont statute provides that in a medical malpractice action, the plaintiff has the burden of proving the following elements:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont.

(2) That the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

12 V.S.A. § 1908. These statutory elements are consistent with the general elements required in a tort claim based on negligence. *See, e.g.*, *Zukatis by Zukatis v. Perry*, 165 Vt. 298, 301 (1996) (citing *O'Connell v. Killington, Ltd.,* 164 Vt. 73, 76 (1995)) ("Common law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury.").

At the same time that § 1908 was added, the legislature also added § 1909 (originally enacted as "§ 1910" but later renumbered to "§ 1909"), which was titled "Limitation of medical malpractice action based on lack of informed consent." *See* 1975 Vt. Acts & Resolves 368, No. 250, § 3 (Adj. Sess.). Section 1909 defines "lack of informed consent as either:

(1) The failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation; or

(2) The failure to disclose the information required by subsection (d) of this section.

12 V.S.A. § 1909(a). Subsection (d) of Section 1909 provides that "[a] patient shall be entitled to a reasonable answer to any specific question about foreseeable risks and benefits, and a medical practitioner shall not withhold any requested information." *Id*. at § 1909(d). The statute provides an affirmative defense where a "reasonably prudent person in the patient's position would have undergone the treatment or diagnosis if he or she had been fully informed." *Id*. at § 1909(c)(4). The statute also requires judgment for the defendant as to any medical malpractice action based solely on informed consent if, at the end of plaintiff's case, "the plaintiff has failed to adduce expert medical testimony in support of the allegation that he or she was not provided sufficient information as required by [Section 1909(a)(1)]. *Id*. at § 1909(e).

In moving for summary judgment, Defendant argues three points: (1) that Plaintiff produced no evidence that Dylan would have declined the Ross Procedure had he been informed of the alleged undisclosed risks; (2) that "physician-specific" information—such as a physician's statistical success/complication rate for a particular procedure and whether there are more experienced surgeons at other medical facilities who could perform that procedure—cannot form the basis of an informed consent claim under 12 V.S.A. § 1909; and (3) that a reasonable patient in Dylan's position would not have changed his mind based on a risk level of 5%, after consenting to the procedure based on a risk level of 2%, or no reasonable jury could so conclude.

Plaintiff counters that (1) as a matter of law, Plaintiff need not establish that Dylan would have declined the Ross Procedure if informed of the alleged undisclosed risks and, alternatively, Plaintiff has established that Dylan would have declined the procedure if properly informed; (2) Dylan was entitled to a reasonable answer when Plaintiff asked the doctor about his experience with the Ross Procedure, and the doctor's answer that he was "very experienced" and "not to worry" about that was inaccurate, misleading, and amounted to a withholding of requested information; and (3) an individual's decision to knowingly consent to major surgical procedure is a product of numerous factors, including the surgeon's experience, accurate information regarding the risks of various surgical options, and an accurate description of the reasonable alternatives, and that therefore a reasonable person in Dylan's position would have changed his mind if fully informed. The Court addresses each of these arguments in turn.

## I.     Subjective or "Particular Patient" Causation

Defendant's first basis for summary judgment raises the issue of causation, specifically whether the plaintiff must prove subjective (particular patient) causation in a medical malpractice action based on lack of informed consent in Vermont. The Court concludes that in an informed consent action, subjective causation is part of the plaintiff's burden of proof. Therefore, the plaintiff must prove as part of the prima facie case that the particular patient (here, Dylan) would have declined the procedure if he had been adequately informed about the benefits, risks, and alternatives. In the instant case, the Court also concludes that Plaintiff has met her burden as to this element because genuine issues of material fact exist as to whether Dylan would have declined the procedure if adequately informed.

The parties agree that the Vermont informed consent statute designates the lack of *objective* causation as an affirmative defense. This is clear from the statutory language. *See* 12 V.S.A. § 1909(c)(4) ("It shall be a defense to any action for medical malpractice based upon an alleged failure to obtain such an informed consent that . . . [a] reasonably prudent person in the patient's position would have undergone the treatment or diagnosis if he or she had been fully informed."); *see also Lubinsky v. Fair Haven Zoning Bd.,* 148 Vt. 47, 49 (1986) (court effectuates legislative intent by first "examin[ing] the plain meaning of the language used in light of the statute's legislative purpose").

Because the objective "reasonably prudent patient" standard is an affirmative defense, it cannot also be a required element of the plaintiff's action. If that were the case, plaintiff would be required to prove—in order to satisfy the proximate cause element—that a reasonable person

in the patient's position would not have undergone the treatment if adequately informed. If plaintiff meets this burden, then according to Section 1909(c)(4), the defendant then has an opportunity to reargue the same issue, to prove that a reasonable person in the patient's position would have undergone the treatment. Such a redundant situation would be nonsensical and absurd, which is presumably why neither party has advanced that particular argument. *See Delta Psi Fraternity v. City of Burlington*, 2008 VT 129, ¶ 7, 185 Vt. 129 (court will not interpret statute so as to produce unreasonable or irrational results).

The fact that the objective standard of causation is not an element of the plaintiff's action means that, following Plaintiff's argument to its logical conclusion, the element of decisional causation[4] in a medical malpractice suit based on lack of informed consent would be effectively eliminated. Such a result is contrary to the plain language of Sections 1908 and 1909, the legislative intent behind those statutes, and basic principles of tort law. *See Long Trail House Condo. Ass'n v. Engelberth Const., Inc.*, 2012 VT 80, ¶ 26, 192 Vt. 322 (rejecting Maryland court's approach for "inconsisten[ce] with basic negligence principles"); *Endres v. Endres*, 2008 VT 24, ¶ 13, 185 Vt. 63 (2008) (noting that its approach in requiring plaintiff to show defendant's actual or constructive knowledge of STD infection was in "keeping with the general principles underlying common-law negligence"). Section 1909 must be read in conjunction with Section 1908, which was part of the same legislative enactment. *See Christman v. Davis*, 2005 VT 119, ¶¶ 8–10, 179 Vt. 99 (reading §§ 1908 and 1909 together in determining whether medical malpractice statutes preempted a medical battery claim); *Delta Psi Fraternity*, 2008 VT 129, ¶ 7 (quoting *Lubinsky*, 148 Vt. at 50) ("The legislative 'intent is most truly derived from a consideration of not only the particular statutory language, but from the entire enactment, its reason, purpose and consequences.'"). Section 1909 governs medical malpractice actions "based on lack of informed consent," and Section 1908 contains a clear subjective causation element. There is no indication or suggestion that Section 1909 should be read to have eliminated or somehow relaxed that element in informed consent cases.[5] Therefore, the Court concludes that to be successful in this action, Plaintiff must prove that the lack of informed consent was a

---

[4] "Decisional" causation is to be distinguished from "injury" causation. Both types of causation are required in an informed consent claim. Decisional causation means that the patient would not have undergone the procedure if fully informed of the risks (i.e., the lack of informed consent *caused* the patient to *decide* to undergo the procedure). Injury causation, on the other hand, means that the patient's *injuries resulted* from the *actual procedure*, rather than from some other or superseding cause, and is generally an element of any negligence claim. *See, e.g.*, *Long Trail House Condo. Ass'n v. Engelberth Const., Inc.*, 2012 VT 80, ¶ 26, 192 Vt. 322 (noting that an element of common law negligence is a "causal link between the breach and the injury"). The Court makes this distinction simply to clarify that "injury" causation, although a required element of Plaintiff's case, is not a contested issue for the purposes of this motion. Only the "decisional" aspect of the causation element is addressed here.

[5] Plaintiff spends a considerable number of pages detailing the legislative history of Sections 1908 and 1909, essentially arguing that the law on informed consent is set forth only in § 1909, and that because the element of particular patient causation is not explicitly provided in § 1909, the legislative intent must have been to eliminate that element from an informed consent claim. *See* Pl.'s Resp. to Def.'s Mot. Summ. J. 6–10 and Exs. 11–15. Plaintiff's argument is unpersuasive. The Court observes that § 1909 also does not explicitly provide for the element of injury causation. Does Plaintiff mean to suggest, then, that she need not prove that the patient's injury resulted from the procedure to which the patient consented? Section 1909 also does not explicitly provide for the element of harm. Does Plaintiff similarly contend that she need not prove that the patient suffered any actual harm, a basic element of any tort claim? Plaintiff's argument, taken to its logical conclusion, is completely nonsensical, and ignores basic principles of statutory interpretation. *See, e.g.*, *Delta Psi Fraternity*, 2008 VT 129, ¶ 7.

proximate cause of Dylan's death, by showing that *Dylan* would not have undergone the Ross Procedure if he had been fully informed.[6]

Although Vermont case law has not directly addressed this issue, to the extent it has, it either supports this Court's conclusion or is not inconsistent. The Vermont Supreme Court stated in *Small v. Gifford Memorial Hospital* that "the evidence relative to the differing response by the particular patient had he or she received the information as to the risks involved has relevance as to proof of causation, necessary to support recovery." 133 Vt. 552, 558 (1975). The Court further declared that the physician's failure to furnish material information is "causative if it results in consent otherwise not forthcoming." *Id*. The *Small* decision clearly indicates that a subjective standard of causation is required in an informed consent action.

In a later case, *Macey v. James*, the Court rejected the plaintiff's proposed jury charge as to the causation element. 139 Vt. 270, 272 (1981). In affirming the trial court's refusal to charge the jury as requested by plaintiff, the Court explained that in a medical malpractice action based on lack of informed consent:

> the patient must show that the injuries he has suffered were caused by the physician's failure to disclose the risks associated with the procedure. This usually means that the *plaintiff must show that a reasonable person would not have consented to the procedure if he had known of the risks involved*. The charge offered by the plaintiff was incorrect because it did not require the plaintiff to show that his injuries were caused by the defendant's failure to warn of the risks of the angiogram.

*Id*. (internal citations omitted) (emphasis added). Although the Court suggested here that *objective* causation was a required element of the plaintiff's case—which seems contrary to *Small*—the Court's holding in *Macey* was based on New Hampshire law at the time, which the parties had agreed was controlling in that case. *Id*.

The third major Vermont case on informed consent dealt with wrongful conception following a vasectomy. *See Begin v. Richmond*, 150 Vt. 517 (1988).[7] Plaintiffs husband and wife

---

[6] The Court notes that, although model jury instructions are "not blessed with any special precedential or binding authority," *McDowell v. Calderon*, 130 F.3d 833, 840 (9th Cir. 1997), they can be quite instructive, and indeed the Vermont Supreme Court has cited to model instructions as persuasive support. *See, e.g.*, *Barber v. LaFromboise*, 2006 VT 77, ¶ 16, 180 Vt. 150 (citing to Dinse et al., Vermont Jury Instructions: Civil and Criminal § 7.28, at 7–79 (1993), for proposition that court must instruct on defendant's burden of proof regarding comparative negligence). For whatever precedential value it may be worth, the Court observes that at least two sets of model jury instructions require a subjective "particular patient" causation standard in a medical malpractice action based on lack of informed consent. *See* Vermont Bar Association, Vermont Civil Jury Instruction Committee, Plain English Jury Instructions § 7.4 (updated Nov. 1, 2007) ("To win this claim, [name of plaintiff] must prove all three of the following: . . . (2) If [name of plaintiff] had known about these risks, benefits and alternatives, [he/she] probably would not have agreed to have the [treatment/procedure]"); Vermont Trial Lawyers Association, Vermont Pattern Jury Instructions for Personal Injury Cases § 3.6(a) (1995) ("Furthermore, [he][she] must show that if [he][she] had been given the required information [he][she] would not have proceeded.") (italics in original).

[7] Another Vermont Supreme Court decision, issued between *Macey* and *Begin*, briefly discussed informed consent. *See Perkins v. Windsor Hosp. Corp.*, 142 Vt. 305 (1982). However, to the extent *Perkins* dealt with informed

sued the doctor, alleging that he was negligent in failing to warn of the possibility of recanalization after the eighth month following the surgery, and that they had relied on his statements that the vasectomy was a total success by discontinuing other contraception methods. *Id*. at 519. The trial court ruled that this was not an informed consent case, however, partly because plaintiffs had not pled that theory, and therefore the case was charged to the jury as a standard medical malpractice case with the elements provided in 12 V.S.A. § 1908 rather than an informed consent case with the elements of § 1909. *Id*. at 520. The Supreme Court held that plaintiffs made a sufficient showing to go to the jury on a traditional medical malpractice theory. *Id*. at 521.

The defendant's main argument in *Begin*, however, was that plaintiffs' case was governed by the informed consent statute and not the general malpractice statute, "because the informed consent statute covers any claim based on a 'failure to disseminate proper information with regard to medical procedures.'" *Id*. at 522. This argument, held the Court, misapprehended the nature of the theory of informed consent. *Id*. Writing for the Court, Justice Dooley explained that the doctrine of informed consent was first recognized in Vermont in *Small v. Gifford* "as an addition to the then-existing theories on which a medical care provider could be found liable for malpractice. . . . in order to get around the often insurmountable obstacle of producing expert testimony to show the defendant was negligent." *Id*. The legislature then codified the doctrine of informed consent "in part to freeze its development well short of strict liability." *Id*. at 523. Therefore, the Court concluded, the informed consent statute does not foreclose a traditional medical malpractice action pursuant to 12 V.S.A. § 1908 based on failure to disseminate proper information regarding medical procedures. *Id*. at 523–24.

Although the Court's main focus in *Begin* was the scope of a traditional malpractice action under § 1908, it briefly discussed the causation element of § 1909. "Like the common law rule announced in *Small*, a prerequisite to liability [under the statute] is that a reasonable patient would not have given consent to the medical procedure if he had fully known of the risks." *Id*. (citing 12 V.S.A. § 1909(c)(4); *Macey*, 139 Vt. at 272). The Court further clarified in a footnote that:

> There is one difference between the common law as announced in *Macey v. James* and *Small* and the requirements of the statute. Under the cases, the non-consent element is part of the plaintiff's burden. *See Macey v. James,* 139 Vt. at 272. The statute makes nonconsent by the fully informed reasonably prudent patient an affirmative defense. 12 V.S.A. § 1909(c)(4).

*Begin*, 150 Vt. 517, 523 n.2. Although *Begin* explicitly states that objective causation (or the absence thereof) is an affirmative defense under the statute and part of the plaintiff's burden under the common law, *see id*. at 523 n.2, it does not directly address whether a subjective non-consent element is part of the plaintiff's burden. However, it makes clear that the objective standard of causation is the defendant's burden rather than the plaintiff's, meaning that there

---

consent, it dealt only with the sufficiency of expert medical evidence to support an informed consent claim. *Id*. at 308–10; *see also* 12 V.S.A. § 1909(e) (requiring plaintiff to "adduce expert medical testimony in support of the allegation that he or she was not provided sufficient information as required by [Section 1909(a)(1)]").

must be a subjective test of causation that is part of the plaintiff's case; otherwise, the element of decisional causation in the prima facie case would be non-existent.[8][9]

Plaintiff expresses concern that requiring particular patient causation is a minority position. It is true that most jurisdictions employ an objective standard, and some courts have expressly rejected subjective causation in favor of objective causation. Those courts have contended that subjective causation would be "based solely on the plaintiff's testimony," and that testimony would be "unreliable due to its speculative nature, hindsight, bitterness, and bias." *See* Evelyn M. Tenenbaum, Revitalizing Informed Consent and Protecting Patient Autonomy: An Appeal to Abandon Objective Causation, 64 Okla. L. Rev. 697, 728 (2012) (citing *Canterbury v. Spence*, 464 F.2d 772, 791 (D.C. Cir. 1972); *McPherson v. Ellis*, 287 S.E.2d 892, 896 (N.C. 1982). The plaintiff would give "a speculative answer to a hypothetical question" as to whether he would have "decided differently knowing something he did not know," and some courts have found this testimony to have "so much uncertainty that its credibility is minimal." *Id.* (quoting *Canterbury*, 464 F.2d at 791; *Roybal v. Bell*, 778 P.2d 108, 117 (Wyo. 1989) (Urbigkit, J., dissenting)). Additionally, courts have observed that subjective causation could preclude recovery if the patient died prior to trial, because after death, the patient obviously cannot testify as to what he would have decided if fully informed. *See Ashe v. Radiation Oncology Associates*, 9 S.W.3d 119, 122 (Tenn. 1999); *Roybal*, 778 P.2d 108, 112; *Fain v. Smith*, 479 So.2d 1150, 1155 (Ala. 1985). This latter point is Plaintiff's primary concern, because here the patient has died and thus cannot testify. The Court first notes that the patient's testimony is not the sole means by which a patient can prove subjective decisional causation. *Cf. Wilkins v. Lamoille County Mental Health Services, Inc.*, 2005 VT 121, ¶ 12, 179 Vt. 107. Like intent in criminal cases, decisional causation can be also proven by the surrounding circumstances. *See, e.g.*, *State v. Johnson*, 2013 VT 116, ¶¶ 29–30; *State v. Cole,* 150 Vt. 453, 456 (1988). Moreover, this Court will not relax the decisional causation element because the patient's death has created a potential barrier to proof. That is a matter involving public policy considerations best addressed by the legislature. *See Wilkins*, 2005 VT 121, ¶ 10–12 ("We recognize . . . the difficulties of proof that may inhere in meeting the traditional causation standard in malpractice cases, and the potentially

---

[8] Another reasonable inference as to the Supreme Court's position on this issue results from an omission in *Begin*. Although the Court summarized the defendant's argument to the trial court as to why a directed verdict motion should have been granted, including defendant's contention that plaintiffs did not meet the elements of 12 V.S.A. § 1909 "because they failed to show that [husband] would not have had the vasectomy operation if he knew the omitted facts," the Court did not comment on defendant's assertion that the informed consent statute included a subjective non-consent element as part of the plaintiff's burden. *Begin*, 150 Vt. at 519–20. It was not necessary to address this point because, as discussed above, the main issue in *Begin* involved the application of the standard medical malpractice elements in § 1908 (rather than the informed consent elements in § 1909) to plaintiffs' wrongful conception claim. *Id.* at 522–24. Nonetheless, the Court's failure to comment on or otherwise qualify defendant's assertion that § 1909 contains a subjective causation element raises, at the very least, a reasonable inference that defendant's subjective causation assertion was an accurate statement of the law.

[9] The Federal District Court for the District of Vermont also briefly discussed § 1909 in *Short v. United States*, 908 F.Supp. 227, 237-38 (Vt. 1995). The court concluded that the evidence did not support plaintiff's informed consent claim because a reasonable patient presented with the doctor's preliminary diagnosis would have chosen the same treatment option of watchful waiting. *Id.* at 238. However, the court's decision is of little guidance because it contained virtually no analysis for this conclusion. Although decisions of federal district courts are not binding on state courts, *see, e.g.*, *State v. Cate*, 165 Vt. 404, 414-415 (1996); *State v. Austin*, 165 Vt. 389, 393-394 (1996), this Court does note the district court's general statement that it "does not interpret § 1909 as imposing on a physician a general duty to inform a patient of each and every possible risk of treatment." *Short*, 908 F.Supp. at 238.

harsh outcomes that may result. . . . Such complexity does not, however, militate in favor of lowering the causation threshold."); *see also Smith v. Parrott*, 2003 VT 64, ¶¶ 12–14, 175 Vt. 375.

Additionally, courts and commentators have described policy considerations that advocate subjective causation and oppose objective causation. The objective test of causation, "denying recovery unless reasonable people would have refused the operation—is more or less unique to the medical informed consent cases," although it seems to be followed in most states. Dan Dobbs, The Law of Torts § 250, at 657 (2001); *see also* Tenenbaum, *supra* at 716 n.109 (collecting cases and statutes, and listing only four states that explicitly follow a subjective standard in informed consent cases: New Hampshire, Rhode Island, Oklahoma, and Oregon). The rule is unique because it "does not reflect the causation requirement" but imposes an "additional and most unusual obstacle." *Id*. Dobbs explains that the rule's real effect is to "limit the defendant's duty of disclosure for the protection of patients who have the same feelings about the risks and advantages of the operation that the mainstream of reasonable people would have." *Id*. Thus, "[t]he special concerns of an individual get no protection under this rule and 'a patient's right of self-determination is irrevocably lost.' The underlying right of the patient to decide for herself becomes a right to decide only so long as people in general would think her decisions reasonable." *Id*. Another commentator writes that objective causation is "unfaithful" to the "underlying ideals" and "primary purpose" of informed consent laws, namely individual patient autonomy. Tenenbaum, *supra* at 718–19; *see also Scott v. Bradford*, 606 P.2d 554, 559 (Okla. 1979) (observing that the "'reasonable man' approach has been criticized by some commentators as backtracking on its own theory of self-determination. [It] certainly severely limits the protection granted an injured patient.").

The Court further observes that, although the vast majority of states follow an objective standard, even those states differ in the objective standard's precise application. Some courts and legislatures have added a subjective component to an otherwise objective causation standard in order to allow juries to take the individual's patient's needs into account. *See* Tenenbaum, *supra* at 725–27 n.155–66 (collecting cases and statutes); *see also* Alan J. Weisbard, Informed Consent: The Law's Uneasy Compromise with Ethical Theory, 65 Neb. L. Rev. 749, 758 (1986). For example, while some jurisdictions suggest that a particular patient's testimony as to whether he or she would have consented is irrelevant to the objective standard, *see, e.g.*, *Schreiber v. Physicians Ins. Co. of Wis.*, 588 N.W.2d 26, 33 (Wis. 1999) ("The objective test . . . focuses on what the attitudes and actions of the reasonable person in the position of the patient would have been rather than on what the attitudes and actions of the particular patient of the litigation actually were."), other jurisdictions provide that a particular patient's testimony is relevant, although not determinative. *See, e.g.*, *Boone v. Goldberg*, 396 Md. 94, 124 (2006) (under the objective standard, "the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue"); *Funke v. Fieldman*, 512 P.2d 539, 550 (Kan. 1973) (patient's testimony is relevant as to objective causation, "but should not be controlling"); *Roybal v. Bell*, 778 P.2d 108, 112 (Wyo. 1989) ("Under the objective test, the patient's hindsight testimony is relevant but not controlling.").

In the end, however, the Court's legal conclusion that Plaintiff must prove subjective causation as an element of her case-in-chief does not mandate summary judgment for Defendant,

because the Court finds that Plaintiff has demonstrated that genuine issues of material fact exist as to whether Dylan would have undergone the Ross procedure if fully informed. Plaintiff has submitted evidence showing that Dylan had cancelled a previously scheduled Ross Procedure in October 2009. *See* PSMF ¶ 14. Dylan remained "very anxious" about the procedure in February 2010, and asked Dr. Schmoker for an increase in his anxiety medication. PSMF ¶ 14. Dylan and mother struggled with whether to undergo the surgical procedure, and which procedure to undergo. Deposition of Joseph Schmoker 47 (Ex. 8 to PSMF). This evidence tends to show that Dylan was on the fence about whether to undergo the procedure, and was therefore more likely than not to have decided against undergoing the procedure if fully informed of the risk level and Dr. Schmoker's experience, or so a jury could reasonably conclude. This is enough to avoid summary judgment as to the subjective causation element. Additionally, Dylan and Plaintiff would write notes back and forth to each other during medical appointments, and Plaintiff apparently spoke for Dylan much of the time. PSMF ¶ 14. This special relationship between Dylan and Plaintiff tends to support Plaintiff's testimony that had she been fully informed about Dr. Schmoker's experience with the Ross procedure, neither she nor Dylan would have consented to the procedure. PSMF ¶ 14. Although Plaintiff's testimony in this regard is indeed speculative and would not be enough, by itself, to survive summary judgment, the evidence of Plaintiff's relationship with Dylan gives it a bit more weight than it would otherwise have, and buttresses this Court's denial of summary judgment as to subjection causation.

The ultimate credibility of the evidence detailed above is not for the Court to determine, but for the jury as finders of fact. In determining a summary judgment motion, the court must draw all reasonable inferences in favor of the non-moving party. Based on the evidence presented, a jury could reasonably conclude that Dylan would not have undergone the Ross Procedure if fully informed. Although Dylan's death obviously prevents him from testifying as to what he would have done, the evidence of his emotional effect at the time of consent is relevant circumstantial evidence as to whether he would have declined the procedure with additional information, and is enough to avoid summary judgment. Therefore, summary judgment is denied as to Plaintiff's claim under either § 1909(a)(1) or § 1909(d) in response to Defendant's first argument regarding the element of subjective causation.

## II.      Duty to Provide Physician-Specific Information

Defendant's second argument for summary judgment raises two distinct issues: (1) whether Defendant had an *affirmative* duty under 12 V.S.A. § 1909(a)(1) to disclose "physician-specific" information to the patient, such as Defendant's success/complication rate with the Ross Procedure, and the availability of other facilities or more experienced surgeons who could have performed the procedure; and (2) whether Defendant had a *responsive* duty under § 1909(d) to disclose such information as a result of Plaintiff's question about Defendant's experience. These are both issues of first impression in Vermont. The Court addresses each issue in turn.

### A.   Affirmative Duty under § 1909(a)(1)

The Court holds that "physician-specific" information cannot form the basis for an informed consent claim under 12 V.S.A. § 1909(a)(1). Section 1909(a)(1) limits the required disclosure to the reasonably foreseeable risks and benefits of the *treatment* and alternatives thereto, and physician-specific information (i.e., a physician's experience, success/complication

rate, etc.) is precluded from an informed content claim because the duty to disclose under Vermont's statute is based on a "reasonable physician standard" rather than a "reasonable patient standard." As a matter of law, physicians do not have an affirmative duty to disclose such "physician-specific" information to the patient. Here, therefore, Dr. Schmoker did not have a duty to affirmatively disclose his experience with the Ross Procedure to Dylan under § 1909(a)(1).

Vermont's informed consent statute employs a "professional" duty standard, as opposed to a patient-centered standard. Physicians have a duty to disclose "as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation." 12 V.S.A. § 1909(a)(1). Although the Vermont Supreme Court has not addressed whether this duty to disclose under § 1909(a)(1) encompasses so-called "physician-specific" information, New York's informed consent statute is similar to the Vermont statute, *see* N.Y. Pub. Health Law § 2805-d (McKinney's),[10] and New York courts have barred physician-specific information from forming the basis for an informed consent claim, holding that informed consent does not require disclosure of the qualifications of personnel providing the professional treatment. *See, e.g.*, *Johnson v. Jacobowitz*, 884 N.Y.S.2d 158,

---

[10] The full text of New York's informed consent statute reads as follows:

> 1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.
>
> 2. The right of action to recover for medical, dental or podiatric malpractice based on a lack of informed consent is limited to those cases involving either (a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body.
>
> 3. For a cause of action therefor it must also be established that a reasonably prudent person in the patient's position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought.
>
> 4. It shall be a defense to any action for medical, dental or podiatric malpractice based upon an alleged failure to obtain such an informed consent that:
>
> > (a) the risk not disclosed is too commonly known to warrant disclosure; or
> > (b) the patient assured the medical, dental or podiatric practitioner he would undergo the treatment, procedure or diagnosis regardless of the risk involved, or the patient assured the medical, dental or podiatric practitioner that he did not want to be informed of the matters to which he would be entitled to be informed; or
> > (c) consent by or on behalf of the patient was not reasonably possible; or
> > (d) the medical, dental or podiatric practitioner, after considering all of the attendant facts and circumstances, used reasonable discretion as to the manner and extent to which such alternatives or risks were disclosed to the patient because he reasonably believed that the manner and extent of such disclosure could reasonably be expected to adversely and substantially affect the patient's condition.

N.Y. Pub. Health Law § 2805-d (McKinney's).

162 (N.Y. App. Div. 2d Dep't 2009) (court correctly precluded evidence that surgeon did not have proper credentials to perform heartport procedure, because informed consent does not require disclosure of treatment provider's qualifications); *Abram v. Children's Hosp. of Buffalo*, 542 N.Y.S.2d 418–19 (N.Y. App. Div. 4th Dep't 1989) (plaintiffs could not proceed in informed consent action on ground that patient was never fully or properly informed that nurse anesthesiologist, student physician, and/or obstetrics/gynecology resident were to "participate vitally in administration of anesthetic during her surgery," because statutory definition of informed consent "covers disclosure of alternatives to treatment, and risks and benefits involved in treatment; it cannot reasonably be read to require disclosure of qualifications of personnel providing that treatment"); *Zimmerman v. New York City Health and Hospitals Corp.*, 458 N.Y.S.2d 552, 554 (N.Y. App. Div. 1983) (jury instructions were improper insofar as they could have been interpreted as suggesting that "a failure to state explicitly details as to surgeon's training and experience was a factor that might properly be considered" in determining whether there was informed consent to operation); *Henry v. Bronx Lebanon Medical Center*, 385 N.Y.S.2d 772, 775 (N.Y. App. Div. 1976) (issue of alleged failure to obtain patient's consent to have resident deliver her baby under direct supervision of physician should not have been given to the jury, where it was hospital's custom for all obstetricians to allow residents in their training to handle complicated deliveries); *Cipriano v. Ho*, 908 N.Y.S.2d 552, 554–55 (N.Y. Sup. 2010) (failure to disclose professional misconduct determination or related penalty cannot support informed consent action, even if expert opinion that failure to disclose constitutes departure from good and accepted medical practice).

New York's treatment of physician-specific information as to informed consent claims is in line with a number of other jurisdictions. *See, e.g.*, *Whiteside v. Lukson*, 89 Wash. App. 109, 110–11 (1997) (Washington courts have not adopted the more expansive construction of the physician's duty to disclose; therefore, following traditional approach, "a surgeon's lack of experience in performing a particular surgical procedure is not a material fact for purposes of finding liability predicated on failure to secure an informed consent"); *Foard v. Jarman*, 326 N.C. 24, 31 (N.C. 1990) (North Carolina statute imposed no affirmative duty on provider to discuss his or her experience, and court refused to impose such a duty "where plaintiff's allegations are founded on her speculative and erroneous assumptions about the location of defendant's surgical experience"); *Wlosinski v. Cohn*, 269 Mich. App. 303, 308-09 (2005) ("As a matter of law, . . . a physician's raw success rates do not constitute risk information reasonably related to a patient's medical procedure."); *Ditto v. McCurdy*, 86 Haw. 84, 90 (1997) (informed consent does not require physicians to affirmatively disclose their qualifications or lack thereof to a patient). There are legitimate public policy concerns surrounding the concept of required disclosure of physician-specific information. As one court has explained, "[u]nder this expansive approach, facts such as the physician's statistical success rate, or history of malpractice claims, could also be considered material. . . . In theory, the physician's own health, financial situation, even medical school grades, could be considered material facts a patient would want to consider in consenting to treatment by that physician." *Whiteside*, 89 Wash. App. at 112 (citing 48 Okla. L.Rev. at 751; Aaron D. Twerski, *Comparing Medical Providers: A First Look at the New Era of Medical Statistics,* 58 Brook. L.Rev. 5, 28-29 (1992)); *see also Willis v. Bender*, 596 F.3d 1244, 1256 (10th Cir. 2010) (predicting that "Wyoming would find such an expansion of a physician's informed consent duties to be overly burdensome to physicians").

This Court finds the reasoning of these other jurisdictions' decisions logical and persuasive, and finds the New York courts' decisions particularly instructive considering the similarity between N.Y. Pub. Health Law § 2805-d(1) and 12 V.S.A. § 1909(a)(1). In fact, the language of Subsection 1 of the New York statute and Subsection (a)(1) of the Vermont statute are virtually identical such that, in the absence of Vermont case law regarding physician-specific information in informed consent claims, this Court adopts the New York courts' reasoning. *See Human Rights Comm'n v. Benevolent & Protective Order of Elks,* 2003 VT 104, ¶ 13, 176 Vt. 125 ("[w]here there are similar statutes in other jurisdictions, we are also guided by the interpretations of those statutes"). Physicians and medical practitioners do not have an affirmative duty to disclose physician-specific information to the patient, such as a physician's statistical success/complication rate concerning a particular procedure, the existence of more experienced physicians who could perform the procedure, or the availability of other facilities better equipped to handle the procedure. Plaintiff has not articulated why § 1909(a)(1) should be interpreted any differently than the identical New York statute, and the Court sees no reason to do so. Here, because the information about Dr. Schmoker's personal experience in performing the Ross Procedure, by itself, is not related to a reasonably foreseeable risk inherent to the actual procedure, Dr. Schmoker had no affirmative duty to disclose such information to Dylan under § 1909(a)(1).

To be sure, there is contrary authority. As observed by Dan Dobbs, "[e]xperience and success rate of the physician or surgeon are relevant, not to the decision to accept treatment, but to the decision to accept it at the hands of the defendant." Dobbs, The Law of Torts § 251 at 660 (2001). Some authority has declared that patients are "entitled to information concerning the treating physician's experience with the particular procedure," or at least are so entitled "under particular circumstances." *Id.* at 661 (citing *Hales v. Pittman*, 118 Ariz. 305, 312 (1978) (physician's prior surgical results were relevant to informed consent issue of battery claim); *Bloskas v. Murray*, 646 P.2d 907, 914–15 (Colo. 1982) (in misrepresentation claim analogous to informed consent claim, evidence that surgeon told patient he had performed ankle replacements when he had not was sufficient for jury)). The Arizona Supreme Court has explained this position as follows:

> To properly weigh the advantages of elective surgery with its attributable disadvantages, a person needs information not only concerning the statistical probabilities of various adverse results which have been encountered by other physicians, but also one is entitled to information concerning the treating physician's experience with the particular procedure. For example, assume that as a reasonable medical probability only three percent of all patients die during a given procedure. The meaning of this statistic becomes quite another matter if Dr. "A" has never attempted the operation; Dr. "B" has performed 100 operations with a one percent mortality rate and Dr. "C" has encountered a 15 percent mortality rate in his 40 operations. Yet, if the only information given the patient was the general statistical abstract for the United States, how could that person intelligently determine which, if any, of these physicians to choose?

*Hales*, 118 Ariz. at 312. The Tenth Circuit also listed a number of cases concluding that "physician-specific information such as experience is relevant to the informed consent issue and

physicians have a duty to voluntarily disclose such information prior to obtaining a patient's consent." *Willis v. Bender*, 596 F.3d 1244, 1255 (10th Cir. 2010) (citing *Moore v. Regents of the Univ. of Cal.,* 51 Cal.3d 120, 271 Cal.Rptr. 146, 151-52 (1990) (failure to inform patient of physician's research and economic interests in procedure prior to conducting it); *Barriocanal v. Gibbs,* 697 A.2d 1169, 1170, 1173 (Del. 1997) (failure to disclose that physician had not recently performed aneurism surgery and there were other nearby hospitals that specialized in aneurism surgery); *Hidding v. Williams,* 578 So.2d 1192, 1198 (La. Ct. App. 1991) (failure to inform patient that physician suffered from alcohol abuse at the time of the proposed surgery); *Goldberg v. Boone,* 396 Md. 94, 912 A.2d 698, 717 (2006) (failure to inform patient there were other more experienced surgeons in the region that could perform the proposed procedure); *Johnson v. Kokemoor,* 199 Wis.2d 615, 545 N.W.2d 495, 504-08 (1996) (failure to disclose to patient there are substantially different morbidity and mortality rates of the proposed procedure depending on the physician's experience, for example, an unusually complicated and dangerous brain surgery)). But, as the Tenth Circuit observed, the above cases utilize a reasonable patient standard in determining the scope of a physician's informed consent disclosure, "looking to whether a reasonable person in the patient's position would consider the information material to his decision" to undergo the procedure. *See Willis*, 596 F.3d at 1255-56 (citing *Moore,* 271 Cal.Rptr. at 150; *Barriocanal,* 697 A.2d at 1172-73; *Hidding,* 578 So.2d at 1195; *Goldberg,* 912 A.2d at 716; *Howard v. Univ. of Med. & Dentistry of N.J.,* 172 N.J. 537, 554–57 (2002); *Johnson,* 545 N.W.2d at 501-02). The scope of disclosure is different in a jurisdiction applying a traditional or professional standard, such as New York or Vermont, "asking what a reasonable practitioner of like training would have disclosed in the same or similar circumstances." *Id.*

The Court's legal conclusion, however, does not mandate summary judgment as to Plaintiff's claim under § 1909(a)(1). Plaintiff can still prove her § 1909(a)(1) claim by showing that Dr. Schmoker failed to disclose an accurate risk level of the Ross Procedure, which is not physician-specific information. An inaccurate representation of the risk level of a particular procedure can certainly fall within the scope of a "failure . . . to disclose to the patient . . . the reasonably foreseeable risks . . . involved as a reasonable medical practitioner under similar circumstances would have disclosed," 12 V.S.A. § 1909(a)(1), and Defendant appears to concede that this particular subject matter is appropriate for a claim under § 1909(a)(1). *See* Def.'s Mot. Summ. J. ("DMSJ") 13–14. Plaintiff has submitted expert medical evidence to support this claim as required by § 1909(e); therefore, summary judgment is not appropriate for Plaintiff's § 1909(a)(1) claim in response to Defendant's argument that there was no duty to disclose physician-specific information.

## B. Responsive Duty under § 1909(d)

The second issue is—even if there is no affirmative duty under § 1909(a)(1)—whether a physician's statutory responsive duty under § 1909(d) encompasses physician-specific information. In the present case, two considerations are particularly persuasive. First, Vermont's informed consent statute adds a subjective element to the physician's duty to disclose by requiring the physician to provide a reasonable answer to any specific question posed by the patient. *See* 12 V.S.A. § 1909(d). Although § 1909(a)(1) limits the required disclosure to risks and benefits inherent to the *treatment* or *procedure*, *see supra*, the scope of disclosure required by § 1909(d) clearly goes further. Second, Plaintiff has submitted expert evidence tending to

show that Dr. Schmoker's alleged lack of experience increased the risk for Dylan in undergoing the procedure, unlike cases from other jurisdictions where no such evidence was offered. *See infra*. So-called "physician-specific information" can fall within the scope of § 1909(d). Therefore, Plaintiff's claim under § 1909(d) is not barred as a matter of law simply because it is based on physician-specific information.

Although the Vermont and New York informed consent statutes are similar, they are not fully identical. Vermont's statute is unique in that it also defines "lack of informed consent" as a failure by a medical practitioner to provide a "reasonable answer to any specific question about foreseeable risks and benefits." 12 V.S.A. § 1909(d). Furthermore, "a medical practitioner shall not withhold any requested information." *Id*. New York's informed consent statute contains no similar provision. See N.Y. Pub. Health Law § 2805-d (McKinney's). Therefore, although Defendant does not have a duty to *affirmatively* disclose physician-specific information regarding his experience and whether there were more experienced surgeons or other medical facilities in the region, he may have a duty to disclose this information in *response* to Plaintiff's question regarding his experience, depending on the question.

Like the affirmative duty issue discussed above, Vermont courts have not addressed whether physician-specific information can form the basis for a claim under the responsive duty of § 1909(d). As to other jurisdictions, "[o]nly a few courts have addressed this question, and . . . there is a split of authority." *Willis*, 596 F.3d at 1256. Courts in Wisconsin, New Jersey, and Minnesota, as well as the Tenth Circuit in applying Wyoming law, have concluded that physicians have a duty to truthfully answer a patient's question regarding physician-specific information, while courts in Connecticut and Pennsylvania have gone the other way. This Court briefly addresses each of those decisions in turn, and finds that they provide further support for this Court's conclusion.

In *Johnson v. Kokemoor*, the plaintiff allegedly questioned the defendant surgeon about his experience, and he responded that he had performed the surgery "several times." 199 Wis.2d 615, 624 (1996). When she asked what he meant by "several," he said "dozens" and "lots of times." *Id*. It turned out that he actually had relatively little experience with the type of procedure performed on plaintiff. *Id*. at 624–25. The Wisconsin Supreme Court concluded that evidence of the surgeon's limited experience was properly admitted because "[a] reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery." *Id*. at 641.

In *Howard v. Univ. of Med. & Dentistry of N.J.*, prior to the surgery, the patient's wife had asked the defendant surgeon whether he was board-certified, to which the defendant responded in the affirmative. 172 N.J. 537, 543 (2002). He also told them he had substantial experience with the proposed surgery, performing approximately 60 corpectomies in each of the last 11 years. *Id*. According to the patient's wife, it was only after the defendant's claim of skill and experience that she and her husband consented to the surgery. *Id*. at 543–44. In fact, the defendant was not board-certified and he had significantly overrepresented his experience with the surgery, apparently having performed only "a couple dozen" during his career. *Id*. at 544. The New Jersey Supreme Court concluded that the Howards had stated a lack of informed consent claim, and explained that while a doctor does not have a duty to detail his background

and experience to obtain the patient's consent, a doctor's "significant misrepresentations concerning [his] qualifications can affect the validity of the consent obtained." *Id*. at 555. The defendant's misrepresentations induced plaintiff to consent to a procedure that he would not have undergone if truthfully informed about the doctor's qualifications; "[s]tripped to its essentials, plaintiff's claim is founded on lack of informed consent." *Id*. at 556. *See also Paulos v. Johnson*, 597 N.W.2d 316, 320 (Minn. Ct. App. 1999) (observing that, because defendant misrepresented his status as a board-certified physician as a precursor to patient's surgery, "the claims present a pure informed consent issue").

The Supreme Court of Pennsylvania reached the opposite conclusion in *Duttry v. Patterson*, 565 Pa. 130 (2001). In *Duttry*, a patient sued a surgeon, alleging that the surgeon, in response to pre-surgery queries, exaggerated his experience in performing the surgical procedure in question. *Id*. at 133. The doctor allegedly told the patient that he had performed this particular procedure approximately once every month, although he had apparently performed this procedure only nine times in the preceding five years, "a frequency far below the once a month figure he allegedly gave Duttry." *Id*. On appeal, the Supreme Court of Pennsylvania held that evidence of the doctor's prior experience was inadmissible at trial, because "information personal to the physician, whether solicited or not, is irrelevant to the doctrine of informed consent." *Id*. at 137. The court explained:

> Furthermore, we note that this holding does not shift depending upon whether a patient inquires as to the physician's experience. We find the Superior Court's rationale that evidence of the physician's personal characteristics is relevant to an informed consent claim whenever the particular patient requests such information to be highly problematic. The Superior Court's reasoning on this point is divorced from the fundamental principle of the informed consent doctrine that information is material to the procedure at hand, and therefore must be divulged in order to obtain the patient's informed consent, if a *reasonable person* would wish to know it. This is an objective, rather than subjective, analysis; its calculus does not shift depending on how inquisitive or passive the particular patient is.

*Duttry*, 565 Pa. 130, 136–37 (emphasis in original). The *Duttry* court went on to acknowledge that other states have "broadened their concept of the informed consent doctrine," but it saw "no compelling reason to follow a similar course. . . . Plaintiffs . . . have recourse against allegedly inexperienced and deceptive physicians via other causes of action." *Id*. at 137 n.2. The court suggested that in that particular case, the plaintiff may have a cause of action for misrepresentation. *Id*. at 137.

The Supreme Court of Connecticut reached a similar result in *Duffy v. Flagg*, 279 Conn. 682 (2006). In *Duffy*, the patient asked the physician whether she had encountered any difficulty with the procedure to be performed, known as "vaginal birth after cesarean section delivery." *Id*. at 685. The physician responded that there had been "a bad outcome" because of a uterine rupture. *Id*. The patient did not inquire further, and the physician did not explain that the baby had died as a result of that uterine rupture. *Id*. The patient then decided to attempt this type of delivery, and the patient's baby died from complications during the birth. *Id*. at 685–86.

The Connecticut court concluded that Dr. Flagg's prior experience with vaginal birth after cesarean section did not become relevant to informed consent just because the patient asked about it. *Id*. at 693. First, the court reasoned, that claim ran afoul of Connecticut's objective standard of disclosure: "[w]e do not require a physician to disclose information that a particular patient might deem material to his or her decision, but, rather, limit the information to be disclosed to that which a reasonable patient would find material." *Id*. Second, the information sought by plaintiff "did not relate to any of the four specific factors encompassed by informed consent [as defined in Connecticut]." *Id*. Those four factors are: (1) the nature of the procedure; (2) the risks and hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure. *Id*. at 692. The plaintiff offered "absolutely no evidence that Flagg's prior experience with vaginal birth after cesarean section had any bearing on the risks to the plaintiff from the procedure or that it was otherwise relevant to any of the four established elements of informed consent." *Id*. at 696.[11]

Most recently, the U.S. Court of Appeals for the Tenth Circuit addressed this question in predicting the application of Wyoming law. In *Willis v. Bender*, 596 F.3d 1244 (10th Cir. 2010), the patient Willis asked Dr. Bender

> about his experience and track record with the laparoscopic procedure, whether he had ever been sued and whether he had ever had any problems with his medical license. Bender told Willis he had never been sued, never had any problems with his medical license and his success rate with the laparoscopic procedure was "99.9% right on the mark."

*Willis*, 596 F.3d at 1247. The Tenth Circuit predicted that Wyoming law does not impose a duty on physicians to *voluntarily* disclose physician-specific information, because (1) Wyoming applies the "traditional or professional standard" in determining the scope of a physician's informed consent disclosure, and (2) such an expansion of a physician's informed consent duties would be "overly burdensome to physicians." *Id*. at 1255–56. However, the court predicted that under Wyoming law, a physician does have a duty to truthfully answer a patient's physician-specific questions:

> We emphasize we are not saying Wyoming would impose upon physicians an affirmative duty to *voluntarily* disclose *physician-specific* information or to obtain the approval of a patient's regular physician prior to obtaining consent. Our

---

[11] In reaching this conclusion, the Connecticut Supreme Court distinguished the Connecticut Appellate Court's decision in *DeGennaro v. Tandon*, 89 Conn. App. 183 (2005). In *DeGennaro*, the defendant Dentist failed to inform plaintiff of her inexperience with certain equipment to be used in the procedure, that defendant usually had an assistant present during this type of procedure but would not have one present during plaintiff's procedure, and that defendant's office was not officially open for business at the time the procedure was performed. *Id*. at 185–87. The Appellate Court concluded there was sufficient evidence for the jury to determine a lack of informed consent, and that such information should not be excluded from the dentist's duty to inform "simply because that information was provider specific as opposed to procedure specific." *Id*. at 191. In *DeGennaro*, the provider specific information was related to "the risks posed by the circumstances under which the defendant performed the procedure," and was therefore relevant to one of the four established elements of informed consent in Connecticut. *Id*. This fact was distinguishable from *Duffy*, where the physician's prior experience was not related to the risks of the procedure. *Duffy*, 279 Conn. at 696.

decision is quite narrow. We only predict the Wyoming Supreme Court would allow an informed consent claim where a physician lies to a patient as to *physician-specific* information *in direct response to a patient's questions concerning the same* in the course of obtaining the patient's consent and the questions seek *concrete verifiable facts,* not the doctor's subjective opinion or judgment as to the quality of his performance or abilities.

*Willis*, 596 F.3d at 1260 (emphasis in original). The Tenth Circuit thoroughly summarized the previous caselaw regarding the duty to disclose physician-specific information in order to obtain informed consent. *Id.* at 1256–58; *see also supra*. It concluded that, while the cases are conflicting, the Wyoming Supreme Court would likely follow *Johnson*, *Howard*, and *Paulos*— rather than *Duttry* and *Duffy*—because the former are "better reasoned." *Willis*, 596 F.3d at 1258. It further explained:

> Bender's alleged misrepresentations to Willis in response to her direct questions allegedly induced her to consent to the surgery and its risks. Under these circumstances, if proved, her consent can hardly be considered "informed." We recognize *Duffy* and *Duttry* did not entirely foreclose an action against a physician who lies to a patient in response to questions asked in the course of obtaining consent, stating the patient may have a misrepresentation claim. . . . [W]hen the misrepresentation occurs during the physician-patient relationship and in the course of a physician obtaining the patient's consent to a proposed treatment or procedure, we see no reason why Wyoming would limit the patient's claim to the more generic negligent misrepresentation tort, especially since it is doubtful whether a negligent misrepresentation claim is an avenue of relief available to most patients in Wyoming.

*Id.* at 1258–59.

In rejecting the reasoning of the *Duffy* and *Duttry* courts, the Tenth Circuit argued that its holding would not confuse physicians as to the scope of their disclosure because requiring physicians to honestly answer a patient's questions is a "bright-line rule not subject to conflicting interpretations." *Id.* at 1259. Further, such a requirement would not burden patients with immaterial information because "they would only receive that information they found material enough to request from the physician." *Id.* And the physician, if he thought the requested information was not pertinent, "could simply say so and refuse to answer." *Id.* at 1260. Additionally, the Tenth Circuit found that Wyoming's application of the "traditional or professional standard" of disclosure does not require a different conclusion:

> That standard has only been applied to determine what information a physician is required to *voluntarily* disclose to a patient prior to obtaining his consent. It would appear to have no applicability to determining whether a doctor may lie to a patient *in direct response to the patient's questions* in the course of obtaining the patient's consent. In any event, one would be hard pressed to argue a reasonable physician of like training would lie to a patient in obtaining consent.

*Willis*, 596 F.3d at 1260 (emphasis added).

This Court finds the Tenth Circuit's opinion in *Willis* to be logical, well-reasoned, and highly persuasive, and agrees that the *Duttry* and *Duffy* decisions are easily distinguishable. While *Duffy* involved absolutely no evidence that the doctor's level of experience affected the actual procedure, such evidence has been submitted in the present case. *See* Affidavit of Paul Stelzer ¶¶ 8, 10 (Ex. 4 to PR). Similarly, although *Duttry* concluded that physician-specific information was irrelevant to informed consent whether solicited or not because Pennsylvania's common law employed an objective disclosure duty, that conclusion is inapposite to Vermont's statute, which contains a specific, subjective provision regarding the physician's responsive duty, and does not include the traditional or professional standard as provided in § 1909(a)(1). *See* 12 V.S.A. § 1909(d). The rationales utilized in *Duttry* and *Duffy* are unpersuasive and inapplicable to Vermont's unique informed consent statute.

*Specific Question and Reasonable Answer*

Since Plaintiff's claim under § 1909(d) is not barred as a matter of law simply because it is based on physician-specific information, the Court must next consider whether Plaintiff's question about Defendant's experience gave rise to a duty to disclose. In response to Defendant's contention that Plaintiff's question was not "specific" as required by the statute, the Court declines to find that Plaintiff's question was not "specific" as a matter of law. In *Willis*, as explained above, the Tenth Circuit held that such questions are actionable under the informed consent doctrine where "the questions seek *concrete verifiable facts,* not the doctor's subjective opinion or judgment as to the quality of his performance or abilities." *Willis*, 596 F.3d at 1260 (emphasis in original). The Tenth Circuit further clarified its reference to "concrete verifiable facts" as follows:

> For instance, Willis' questions in this case concerning Bender's experience and track record with the laparoscopic procedure, whether he had ever been sued or had any problems with his medical license, and whether he consulted with and obtained the approval of Dr. Fleck, are verifiable and fact-based. They do not call for Bender's subjective opinion or judgment. Questions such as "how good of a surgeon are you?" are not readily verifiable and call for the doctor's subjective opinion. Such questions are not within the scope of our narrow holding. Whether questions posed to a doctor are actionable are legal questions or at least, mixed questions of law and fact, for the judge to decide, perhaps after a hearing, before sending the issue to the jury.

*Id*. at 1260 n.10. In the present case, although Plaintiff's alleged question about Dr. Schmoker's experience with the Ross Procedure appears not to have been as specifically phrased as the questions at issue in *Willis*, Plaintiff's question is clearly more specific than the example given by the Tenth Circuit of what is not readily verifiable. See *id*. ("how good of a surgeon are you?"). While asking someone "how good" they are at something might call for a subjective opinion as to one's skill, asking someone about their experience may call for concrete, verifiable facts explaining that experience. Drawing all reasonable inferences in favor of Plaintiff, the non-

moving party, a reasonable jury could conclude that by asking Dr. Schmoker about his experience, Plaintiff sought nothing other than information about the outcomes of Dr. Schmoker's prior Ross Procedures. Therefore, this matter is best left to the jury for determination.

Likewise, the Court declines to find that Dr. Schmoker's answer to Plaintiff's question was "reasonable as a matter of law." This inquiry is necessarily dependent upon the specificity of the question. Again, drawing all reasonable inferences in favor of Plaintiff, a jury could reasonably find that Dr. Schmoker's response was inadequate given the question posed.

Defendant contends that Dr. Schmoker's answer "fairly and reasonably met the substance of the question" and "neither Plaintiff nor the decedent bothered to ask any follow-up questions regarding Schmoker's experience, qualifications, or performance rates." Def.'s Reply Supp. Mot. Summ. Judg. at 11. However, a reasonable jury could find that the response of "very experienced" did not sufficiently address Plaintiff's question about the doctor's experience, when Dr. Schmoker had performed nine Ross Procedures at Fletcher Allen, two of which resulted in some level of complications. Based on the circumstances, a jury might reasonably conclude that Dr. Schmoker's response was dismissive or evasive. And although Plaintiff does admit that neither she nor Dylan asked any additional follow-up questions as to Dr. Schmoker's experience, qualifications, or performance rates, a jury is best-suited to hear that evidence and make a determination as to whether Dr. Schmoker's answer was reasonable under the circumstances. Thus, in response to Defendant's argument that Plaintiff's question was not specific and that Dr. Schmoker's answer was reasonable as a matter of law, summary judgment is denied as to Plaintiff's claim under § 1909(d).

### III. Objective or "Reasonable Person" Causation

Finally, Defendant contends it is entitled to summary judgment because a reasonable patient in Dylan's position—a patient "with progressive and life-threatening heart disease"— would not have changed his mind and declined to undergo the procedure if informed that the risk level for the procedure was five percent rather than one to two percent. *See* DMSJ 13. Plaintiff responds that Defendant misstates the operative inquiry and the material facts. Plaintiff contends that, contrary to Defendant's assertions, Dylan did not have a "progressively worsening heart condition," and that he had more potential options than Defendant claims. Pl.'s Resp. to DMSJ 19–20.

The affirmative defense requires Defendant to show not only that a reasonably prudent person would not have changed his mind and declined the procedure if fully informed of the risks and alternatives, but that a "reasonably prudent person *in the patient's position*" would have done so. 12 V.S.A. § 1909(c)(4) (emphasis added). Therefore, the status of Dylan's condition at the time he consented to Dr. Schmoker performing the Ross Procedure is a particularly relevant and important inquiry. There are disputed material facts as to whether Dylan's condition at that time was "life-threatening" and exactly how soon the surgery was needed. For example, while Defendant portrays Dylan's condition as "progressive" and "life-threatening," *see* DSMF ¶ 1, Plaintiff submitted evidence tending to show that Dylan's condition was not necessarily

immediately serious and that waiting several more months before surgery was a reasonable second option. *See* PSMF ¶ 1; Letter from Dr. Kunin 1-2 (Ex. 1 to PSMF).

As Defendant concedes, "the issue of whether a reasonably prudent patient would or would not have consented to a procedure if adequately informed is generally one for a jury to resolve." DMSJ 14. The Court does not believe this case falls within the exception to that general rule, where proximate causation "may be decided as a matter of law where the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." *Collins v. Thomas*, 2007 VT 92, ¶ 8, 182 Vt. 250 (quoting *Estate of Sumner v. Dep't of Soc. and Rehab. Serv's*, 162 Vt. 628, 629 (1994)). The proof is not "so clear" in this case. Despite Defendant's characterization of the alleged three percent difference in risk quantification as "de minimus," a jury could reasonably conclude that, depending on the seriousness of Dylan's heart condition at the time of consent, a reasonable person in Dylan's position may have changed his mind and declined the procedure if informed that the risk level for all major complications was five percent or more, as opposed to one or two percent. Because of the existence of disputed material facts, this question is appropriate for a jury to decide.

## ORDER

For the foregoing reasons, Defendant's Motion for Summary Judgment is **denied**.

So Ordered.

Dated at Burlington, Vermont, May 20, 2014.

 

 

_____
Brian J. Grearson
Superior Court Judge